UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

RAMZI NABER, PHILIP HOUSTON,

and SINZ CLUB, LLC d/b/a FATE,

                Plaintiffs,           CIVIL ACTION

v.                                 CASE NO.:

THE VILLAGE AT GULFSTREAM

PARK, LLC,

                Defendant.

## COMPLAINT

**COME NOW**, the Plaintiffs,  RAMZI NABER, individually, PHILIP HOUSTON, individually, and SINZ CLUB, LLC d/b/a FATE, by and through undersigned counsel, and file this Complaint against THE VILLAGE AT GULFSTREAM PARK, LLC and, as grounds therefor, state the following:

## INTRODUCTION

1. This action seeks legal and equitable relief to redress unlawful discrimination and harassment on the basis of race perpetrated by the above named defendant with reckless indifference to Plaintiffs' rights to enter into and enjoy the benefits of a contract with the defendant in the form of a Commercial Lease Agreement, such activity being protected by 42 U.S.C. § 1981 and applicable State Law.

2.     Plaintiffs seek compensatory damages with respect to Defendant's First Breach of the subject Commercial Lease Agreement, equitable relief in the form of an Order requiring Defendant's Specific Performance of the subject Commercial Lease Agreement, and compensatory and punitive damages for the violation of Plaintiffs' rights to contract free from racial discrimination and harassment pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1981 and 42 U.S.C. § 1988.

## JURISDICTION

3.     This action is authorized and instituted pursuant to 42 U.S.C. §1983, 42 U.S.C. §1981, 42 U.S.C. §1988 as amended, and 28 U.S.C. §1343.

4.     The acts and omissions alleged to be unlawful were committed within Hallandale, Broward County, Florida, and within the jurisdiction of the Southern District of Florida.

5.     This Court has jurisdiction over Plaintiffs' 42 U.S.C. §1983 claim under 28 U.S.C. §1331 and 42 U.S.C. §1988.   The Court has jurisdiction to grant declaratory and further relief as to Plaintiffs' claim for Specific Performance pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court has pendent jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.

## VENUE

6.     Venue is proper under 28 U.S.C. §1391(a), because Defendant's principal place of business is in Hallandale, Broward County, Florida, and because the

wrongful and unlawful acts and omissions complained of herein occurred in in Hallandale, Broward County, Florida.

## PARTIES

7.   RAMZI NABER is a black, African American male and citizen of the State of Florida residing  in Hallandale Beach, Broward County, Florida and, as such, is a member of a federally protected class.

8.   PHILIP HOUSTON is a black, African American male and citizen of the State of Florida residing  in Hallandale, Broward County, Florida and, as such, is a member of a federally protected class.

9.   Plaintiff, SINZ CLUB, LLC d/b/a FATE, is a Florida limited liability company in good standing whose principal place of business is in Hallandale, Broward County, Florida, and which is solely owned and managed by Plaintiffs, RAMZI NABER and PHILIP HOUSTON.

10.   Defendant, THE VILLAGE AT GULFSTREAM  PARK, LLC, is a foreign limited liability company authorized to do business and, in fact doing business in Hallandale, Broward County, Florida.

## FACTS

11.   On about November 30, 2012, Plaintiff, SINZ CLUB, LLC d/b/a FATE, by and through Plaintiff, RAMZI NABER, entered into a Commercial Lease Agreement with Defendant, THE VILLAGE AT GULFSTREAM

PARK, LLC which, pursuant to Article I, Paragraph (e), established a Rent Commencement Date of February 1, 2013 and which, pursuant to Article 1, Paragraph (n), established that the permitted use of the leased premises is as a Night Club and restaurant.

12.    A true copy of that Commercial Lease Agreement is attached hereto as "Exhibit A."

13.    Plaintiff SINZ CLUB, LLC d/b/a FATE is a Night Club principally in the business of playing 'Hip Hop' and / or 'Rap' music popular amongst African Americans.

14.    Section 26.10 of that Commercial Lease Agreement provides for Plaintiffs' Quiet Enjoyment of the Leased Premises; implicit thereto being a right to advertise.

15.    In about January 2016 and prior thereto, Plaintiff SINZ CLUB, LLC d/b/a FATE had contracts with Radio Station "99 Jams" and various 'Hip Hop' local concert promoters to do live broadcasts from the FATE leased premises for the purpose of advertising that night club within the local African American community.

16.    On about January 30, 2016, Plaintiff SINZ CLUB, LLC d/b/a FATE was told by Managers and Representatives of the defendant, THE VILLAGE AT GULFSTREAM  PARK, LLC, that Plaintiff would be allowed to remain

open only if they did not utilize the Radio Station "99 Jams" or any of the promoters various local "Hip Hop" concerts to advertise the SINZ CLUB, LLC d/b/a FATE Nightclub.

17.  Managers and Representatives of the defendant, THE VILLAGE AT GULFSTREAM  PARK, LLC, stated to the plaintiffs in that January 30, 2016 meeting that 'black people scare the customers' of Gulfstream's other businesses, and that they "did not want 'urban hiphopsters' (t)here."

18.  Defendant's demand that Plaintiff SINZ CLUB, LLC d/b/a FATE not advertise with Radio Station"99 Jams" and various 'Hip Hop' local concert promoters was and is substantially based upon intentional, race based discrimination.

19.  Defendant's demand that Plaintiff SINZ CLUB, LLC d/b/a FATE not advertise with Radio Station "99 Jams" and various 'Hip Hop' local concert promoters damaged and continues to cause damages to Plaintiffs.

20.  Section 9.4 of the Commercial Lease Agreement attached as "Exhibit A" provides the Tenant therein with a five (5) year renewal term.

21.  Plaintiffs reasonably relied upon Defendant's pledge to renew the term of the Commercial Lease Agreement when Plaintiffs choose to invest substantial monies to 'build out' the leased premises.

22.   On about June 22, 2017, in substantial compliance with the requirements of the Commercial Lease Agreement, Plaintiffs exercised through counsel their right to possess the leased premises under the terms of the original Lease Agreement for a second period of five (5) years commencing five (5) years from the original Rent Commencement Date of February 1, 2013; i.e. from February 1, 2018 through January 31, 2023.

23.   A true copy of Plaintiffs' written Notice exercising their right to a five (5) year renewal period is attached hereto as "Exhibit B."

24.   Defendant refuses to recognize Plaintiffs' exercise of the five (5) year renewal period provided for in the Commercial Lease Agreement.

25.   Defendant's refusal to recognize Plaintiffs' exercise of the five (5) year renewal period provided for in the Commercial Lease Agreement is substantially based upon intentional, race based discrimination.

26.   Defendant's refusal to recognize Plaintiffs' exercise of the five (5) year renewal period provided for in the Commercial Lease Agreement damages and will continue to cause future damages to Plaintiffs.

## COUNT I - BREACH OF CONTRACT
### o/b/o SINZ CLUB, LLC d/b/a FATE

27.     Plaintiff SINZ CLUB, LLC d/b/a FATE realleges and reavers Paragraphs 1 -
        2, Paragraphs 4 - 6, and Paragraphs 9 -19 as though fully set forth herein.

28.     Plaintiff SINZ CLUB, LLC d/b/a FATE performed its obligations under the
        Commercial Lease Agreement and all conditions precedent hereto have been
        completed, performed or waived.

29.     Defendant's demand that Plaintiff would be allowed to remain open only if
        they did not advertise with Radio Station Radio Station "99 Jams" and
        various 'Hip Hop' local concert promoters constituted a substantial breach
        of the Commercial Lease Agreement.

30.     As a consequence of Defendant's breach of the Commercial Lease
        Agreement, Plaintiff has and continues to suffer damages.

31.     Plaintiff SINZ CLUB, LLC d/b/a FATE is entitled to recover from
        Defendant THE VILLAGE AT GULFSTREAM  PARK, LLC Plaintiff's
        attorney's fees pursuant to Section 26.17 of the contract.

        WHEREFORE, Plaintiff SINZ CLUB, LLC d/b/a FATE demands damages,
pre-judgment and post-judgment interest and all attorney's fees from the defendant
along with such other relief that the Court may deem just.

## COUNT II - SPECIFIC PERFORMANCE
## o/b/o SINZ CLUB, LLC d/b/a FATE

32.    Plaintiff SINZ CLUB, LLC d/b/a FATE realleges and reavers Paragraphs 1 - 2, Paragraphs 4 - 6, Paragraphs 9 -13, Paragraph 17 and Paragraphs 20 - 25 as though fully set forth herein.

33.    Plaintiff SINZ CLUB, LLC d/b/a FATE performed its obligations under the Commercial Lease Agreement and all conditions precedent hereto have been completed, performed or waived.

34.    Plaintiff SINZ CLUB, LLC d/b/a FATE is entitled to a five (5) year extension of the Commercial Lease Agreement from February 1, 2018 through January 31, 2023.

35.    Defendant THE VILLAGE AT GULFSTREAM  PARK, LLC refuses to recognize the renewal.

36.    Plaintiff SINZ CLUB, LLC d/b/a FATE is entitled to recover from Defendant THE VILLAGE AT GULFSTREAM  PARK, LLC Plaintiff's attorney's fees pursuant to Section 26.17 of the contract.

WHEREFORE, Plaintiff SINZ CLUB, LLC d/b/a FATE requests that the Court enter an Order extending the Commercial Lease Agreement pursuant to its original terms for a period of five (5) years, from February 1, 2018 through January 31, 2023, along with such other relief that the Court may deem just.

## COUNT III - RACIAL DISCRIMINATION AND HARASSMENT
### o/b/o Defendants RAMZI NABER and PHILIP HOUSTON

37.     Plaintiffs RAMZI NABER and PHILIP HOUSTON reallege and reaver Paragraphs 1 -25 as though fully set forth herein.

38.     Plaintiffs RAMZI NABER and PHILIP HOUSTON are African American and, as such, are members of a federally protected class ( as are the predominate customers of Plaintiff SINZ CLUB, LLC d/b/a FATE ).

39.     The acts and omissions of the defendant complained of herein concern Plaintiffs' right to contract, which is an activity federally protected by 42 U.S.C. § 1981.

40.     The acts and omissions of the defendant complained of herein are substantially based upon intentional, race based discrimination.

41.     The defendant engaged in acts and omissions complained of herein with reckless disregard of Plaintiffs' rights to contract and do business free from racial discrimination and harassment.

        WHEREFORE, Plaintiffs RAMZI NABER and PHILIP HOUSTON demand from Defendant compensatory damages, prejudgment interest, punitive damages, post judgment interest, and attorney's fees pursuant to 42 U.S.C. §1988, along with such other and further relief that the Court may deem just.

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

*Plaintiffs Demand Trial By Jury*

Respectfully Submitted,

/s/ Eric Yankwitt
Eric Yankwitt, Esq., FBN 24557
Yankwitt Law Firm, PLLC
2800 W State Road 84, Ste 118
Fort Lauderdale, FL 33312-4812
Office        : 954-449-4368
Fax           : 954-763-2825
primary email      :  yankwittlawfirm@gmail.com
secondary email   :  sdm@affproserv.com

# EXHIBIT A

# L E A S E

THIS LEASE MADE AND ENTERED INTO this _____ day of November, 2012, by and between The Village at Gulfstream Park, LLC, a Delaware limited liability company ("Landlord"), having an address for purposes hereof at 901 S. Federal Highway, Hallandale Beach, Florida, 33009; and Sinz Club, LLC, a Florida limited liability company d/b/a Fate ("Tenant"), having an address for purposes hereof at 3515 N. 30th Terrace, Hollywood, Florida, 33021.

### WITNESSETH

### ARTICLE I

### INTRODUCTORY PROVISIONS

Section 1.0 - Basic Lease Provisions.

The following Basic Lease Provisions are presented in this Section 1.0 for the convenience of the parties only and are not intended to constitute an exhaustive list of all charges which may become due and payable under this Lease.

(a)   Shopping Center:                                                     (Article I, Section 1.1 [f])
      The Village at Gulfstream Park

(b)   Unit No.:                        2499

(c)   Approximate
      Premises GLA:         5,583 square feet.

(d)   Term of Lease:
      5 Lease Years commencing on the Rent Commencement Date (as hereinafter defined) and expiring on the Term Expiration Date (as hereinafter defined).

(dd)  Renewal Option(s):                                              (Article IX, Section 9.4)
      One (1) five (5) year option to renew the Lease exercisable upon no less than six (6) months prior written notice to Landlord.

(e)   Rent Commencement
      Date:               The earlier of (i) February 1, 2013 ("Outside Date"); or (ii) the date Tenant opens for business.

(f)   Term Expiration
      Date:
      The day prior to the fifth anniversary of the Rent Commencement Date.  In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, the Term Expiration Date shall be deemed to be midnight on the last day of the calendar month in which the Term Expiration Date occurs.

(g)   Rent:                                                              (Article XI, Section 11.1)
      The greater of $5,000 or 10% of Gross Revenue per month

(h)   Percentage Rent:                                                 (Article XI, Section 11.2)
      10% of monthly Gross Revenue in excess of $50,000 (see Rent above)

(i)   Additional Rent:                                                  (Article XI, Section 11.3)
      None

(j)   Real Estate Taxes:   None

(k)     Common Area Utility                                          (Article XI, Section 11.5)
        and Insurance Costs: None

(l)     Premises Utilities:                                          (Article XII, Section 12.2)
                                Payable by Tenant as billed per metered.

(m)     Trade Name:             Club Fate                           (Article VIII, Section 8.1)

(n)     Permitted Use:          Night Club and restaurant           (Article VIII,
Section 8.1)

(o)     Tenant's Billing Address:

                        Attn:  Ramzi Naber_____
                        Contact Phone No.:  248-787-3881_____
                        Contact E-Mail: ramzinaber@gmail.com_____

(p)     Tenant's Notice Address:        3515 N. 30th Terrace
                                        Hollywood, FL  33021        (Article XXV, Section 25.1)

(q)     Landlord's Notice Address:                                  (Article XXV, Section 25.1)
                                        The Village at Gulfstream Park, LLC
                                        901 S. Federal Highway
                                        Hallandale Beach, Florida  33009

(r)     intentionally blank

(s)     Address for
        Payment of Rents:               The Village at Gulfstream Park, LLC
                                        901 S. Federal Highway
                                        Hallandale Beach, Florida  33009

(t)     Address for Percentage Rent
        Reports and Payments:           The Village at Gulfstream Park, LLC
                                        901 S. Federal Highway
                                        Hallandale Beach, Florida  33009

(u)     Guarantor:              None                               (Guaranty)

(v)     Security Deposit:       $5,000                             (Article XI, Section 11.7)

(w)     Construction Allowance: $10,000                            (Article VI, Section 6.0)

Section 1.1 - Defined Terms.

        (a)     "Applicable Laws" shall mean all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force or which hereafter may be in force (collectively "Applicable Laws") which shall impose any duty upon Landlord or Tenant with respect to the initial improvement, use, occupation or alteration of the Premises by Tenant, including, but not limited to, requirements of the Americans with Disabilities Act ("ADA") which may be applicable thereto.

        (b)     "Common Areas" shall mean the Shopping Center amenities, plaza areas, parking areas, driveways, aisles, sidewalks, loading docks, passageways, landscaping, courts, stairs, ramps, elevators, escalators, meeting rooms, public restrooms and other common service areas provided for by Landlord for the common or joint use and benefit of the tenants and occupants of the Shopping Center, their employees, agents, customers and invitees.

        (c)     "Lease Year" shall mean each consecutive twelve (12) month period beginning with the Rent Commencement Date, provided it has occurred on the first day of a calendar month.  In the event that the Rent Commencement Date should occur on a day other than the

first day of a calendar month, a Lease Year shall be each consecutive twelve (12) month period commencing on the first day of the calendar month next following the Rent Commencement Date.

(d)     "Premises" shall mean the specific demised space leased to Tenant by Landlord now existing or to be constructed in the Shopping Center, known as Unit No. 2499, and further being a space containing approximately 5,583 square feet of floor space.

(e)     "Rents" shall mean Fixed Minimum Rent, Percentage Rent, and any and all other sums of money required to be paid by Tenant to Landlord pursuant to this Lease whether or not any of such sums are specifically designated herein as Rents.

(f)     "Shopping Center" shall mean those buildings, land (excluding outparcels along the perimeter of the Shopping Center, if any) and Common Areas comprising the shopping center development owned by and/or ground leased to Landlord and/or the Major Tenants and known as "The Village at Gulfstream Park" located in the City of Hallandale Beach, Broward County, Florida, as shown on Exhibit A attached hereto and made a part hereof, as the same may be changed from time to time by addition thereto or subtraction therefrom, together with the improvements constructed thereon from time to time.  Notwithstanding the foregoing, Landlord expressly reserves the right, in the exercise of its sole discretion, to change the name of the Shopping Center at any time during the Term of this Lease.

(g)     Intentionally Blank

(h)     "Ground Lease" shall mean the Ground Lease dated August 1, 2007 ("Ground Lease") pursuant to which Landlord is leasing the Shopping Center land from Gulfstream Park Racing Association, Inc., the "Ground Lessor."  Landlord and Tenant acknowledge and agree that the Ground Lease shall be deemed to be an "Encumbrance" pursuant to the provisions of Article XVIII.

ARTICLE II
EXHIBITS

Section 2.1 - Exhibits.

The following exhibits are attached hereto or otherwise incorporated herein by reference and made a part of this Lease:

EXHIBIT A     -     Site Plan of the Shopping Center - attached hereto.

EXHIBIT B     -     Inventory of equipment in the Unit  - attached hereto.

EXHIBIT C     -     Tenant Handbook for Shopping Center - containing sign and design criteria - not attached but incorporated herein by reference.

EXHIBIT D     -     User Fee Collection and Remittance Provisions – attached hereto.

ARTICLE III
PREMISES

Section 3.1 - Premises.

In consideration of the payment of all Rents and the performance of all covenants as hereinafter set forth, Landlord demises unto Tenant and Tenant leases from Landlord the Premises as defined in Section 1.1 (b), subject to all conditions and easements of record for the Term of the Lease and upon the terms and conditions set forth in this Lease.

Section 3.2 - Gross Leasable Area of the Premises.

The gross leasable area of the Premises ("Premises GLA") shall be computed based on the lease lines of the Premises defined as follows:  The lease line for common demising walls between adjoining tenants shall be the center line of the common demising wall, and on non-common demising walls such as between the Premises and service corridors, mechanical rooms, or the building exterior, the lease line shall be the outside face of the demising wall. Any recesses required to accommodate the door swing of the exit door for the Premises shall be considered part of the Premises.  No deductions shall be made for existing columns or bracing within the Premises or along the demising walls, but deductions shall be made for the areas occupied by major vertical duct shafts.

Section 3.3 – Intentionally Blank

Section 3.4 - <u>Landlord's Reservation</u>.

Landlord reserves to itself the roof and exterior walls of the building containing the Premises and all space above the ceiling within the Premises to accommodate the Shopping Center's structural, mechanical and electrical conduit, piping, ducting or venting requirements. Landlord and its agents further reserve the right on behalf of themselves or an authorized utility company to run utility lines, pipes, conduit or ductwork when necessary or desirable through the air space above Tenant's ceiling, columns or within the walls of the Premises, and to maintain, repair, alter, replace or remove same in locations which will not materially interfere with Tenant's use of the Premises.

ARTICLE IV
COMMON AREAS

Section 4.1 - <u>Tenant's Use of Common Areas</u>.

(a)      Landlord grants to Tenant and its agents, employees and customers, a non-exclusive license, subject to the reasonable rules and regulations promulgated by Landlord, to use the Common Areas in common with other tenants and occupants of the Shopping Center, their agents, employees and customers during the Term of this Lease, and any renewal period thereof, subject to the exclusive control and management thereof at all times by Landlord and subject further to the rights of Landlord as set forth in Section 4.2 herein.

(b)      Landlord reserves the right to construct, lease and/or license kiosks, carts, and other sales areas on any portions of the Common Areas.

(c)      Tenant shall not use the Common Areas for any other purpose than designated by Landlord.

Section 4.2 - <u>Management and Operation of Common Areas</u>.

Landlord will use commercially reasonable efforts to operate and maintain, or will cause to be operated and maintained, the Common Areas in the best interest of the Shopping Center. Landlord will have the right (1) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas for the general benefit of Landlord and all tenants of the Shopping Center; (2) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the parking areas and fees (if any) for use of such parking areas and other Common Areas; (3) to provide for employee parking and formulate reasonable rules and regulations for same; (4) to close such portions of said parking areas or other Common Areas to such extent as may, in the reasonable opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any right to any person or to the public therein or for any other reason in the best interest of Landlord and all tenants; (5) to close temporarily any or all portions of the Common Areas for repairs or refurbishing; (6) to discourage non-customer parking; (7) to move, remove, relocate and/or replace seats, trees, planters and other amenities; and (8) to do such other acts in and to said Common Areas and improvements in the exercise of good business management, as Landlord, in the exercise of its reasonable business judgment, shall deem advisable.

ARTICLE V
CHANGES AND ADDITIONS TO
SHOPPING CENTER SITE PLAN AND LEASING PLAN

Section 5.1 - <u>Site Plan and Leasing Plan</u>.

The Site Plan and Leasing Plan attached hereto as Exhibits A and B, respectively, are for the sole purpose of showing the approximate shape, design and proposed locations of buildings, tenant spaces and Common Areas located within the Shopping Center.

Section 5.2 - <u>Changes to Shopping Center Site Plan and Leasing Plan</u>.

Landlord reserves the right at any time and from time to time to (a) make or permit changes or revisions in the Site Plan and/or Leasing Plan for the Shopping Center, including additions thereto, subtractions therefrom, rearrangements, alterations, or modifications or supplements to, the building areas, walkways, parking areas, driveways or other Common Areas; (b) construct other buildings or improvements in the Shopping Center and/or to make

alterations thereof or additions thereto, to build additional stories on any such building or buildings, or to build adjoining same; (c) make or permit changes or revisions to the Shopping Center, including additions thereto; and (d) convey portions of the Shopping Center to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof. No such changes, rearrangements or other construction shall permanently reduce the number of parking spaces provided by Landlord below the number of parking spaces required by law.

ARTICLE VI
IMPROVEMENTS

Section 6.0 - <u>Construction Allowance</u>.          $10,000 to cover replacing carpet and door.

Section 6.1 - <u>Landlord's Responsibilities</u>.

In the event Landlord performs any work at the request or on behalf of Tenant which is Tenant's responsibility hereunder, Landlord shall bill Tenant for the costs thereof and Tenant shall reimburse Landlord for such costs no later than twenty (20) days following receipt of Landlord's billing.

Section 6.2 - <u>Tenant's Responsibilities</u>.

On or before the Rent Commencement Date, Tenant shall at its own expense and in accordance with Exhibit C:

(a)       Secure all permits and licenses necessary for the construction of Tenant's Work and Tenant shall comply with all Applicable Laws relating to the conduct of said work. Tenant acknowledges that, unless otherwise specifically provided herein, it or its contractor shall be responsible for paying all fees whatsoever which are charged by the applicable governmental authority in connection with, or as a condition of, the issuance of Tenant's permits.

(b)       Construct the leasehold improvements as shown in Tenant's plans and specifications as approved in writing by Landlord or Landlord's architect as more fully set forth in Section 7.1 herein ("Tenant's Work"). Any installation to be made or work to be performed by Tenant on or for the Premises shall be first approved in writing by Landlord prior to commencement of any such work by Tenant. All trade fixtures installed in the Premises shall be new and of first quality.

(c)       Obtain and maintain on behalf of itself, or any of its contractors or subcontractors, all insurance protection required by Landlord in Exhibit C.

(d)       If a construction barricade is necessary during Tenant's Work, Landlord shall, at its option, either (i) install such barricade on behalf of Tenant and Tenant shall reimburse Landlord within twenty (20) days following receipt of Landlord's billing therefor; or (ii) require Tenant to erect such barricade, at Tenant's expense, in accordance with Landlord's directives.

(e)       Intentionally blank

(f)       In the event Landlord performs any work at the request or on behalf of Tenant which is Tenant's responsibility hereunder, Landlord shall bill Tenant for the costs thereof and Tenant shall reimburse Landlord for such costs no later than twenty (20) days following receipt of Landlord's billing.

Section 6.3 - <u>Tenant's Trade Fixtures</u>.

All trade fixtures, signs and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises during the Term of this Lease shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term, provided Tenant shall not at such time be in Default of any terms or covenants of this Lease, and provided further that Tenant shall promptly repair any damage to the Premises caused by the removal of said fixtures, signs and/or apparatus. If Tenant is in Default under this Lease, Landlord shall have the benefit of any applicable lien on Tenant's property located in or on the Premises as may be permitted under the laws of the State in which the Shopping Center is located, and in the event such lien is asserted by Landlord in any manner or by operation of law, Tenant shall not remove or permit the removal of said property until the lien has been removed and all Defaults have been cured. Any of Tenant's property not removed by Tenant on the Term Expiration Date may be deemed by Landlord as abandoned by Tenant and Landlord may order Tenant to remove said items or have the same removed at Tenant's expense.

Tenant shall have the right to utilize all equipment identified on Exhibit B for the Term of this Lease, provided Tenant maintains such equipment in good condition and returns same to Landlord in good condition upon the expiration of the Term.

Section 6.4 - <u>Labor Cooperation</u>.

Tenant shall perform or cause Tenant's contractor to perform all of Tenant's Work and any repairs, alterations or improvements to the Premises in a manner so as to avoid any labor dispute which causes or is likely to cause a stoppage or an impairment of work or delivery services or any other services in the Shopping Center.  In the event there shall be any such stoppage or impairment as the result of any such labor dispute or potential labor dispute, Tenant shall immediately undertake such action as may be necessary to eliminate such dispute or potential dispute, including, but not limited to (i) removing and/or replacing any or all disputants from the job site until such time as the labor dispute no longer exists; and/or (ii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute.

Notwithstanding the foregoing, in the event any work performed by Tenant or Tenant's contractors results in a labor dispute as set forth above, such labor dispute shall not excuse the performance by Tenant as provided for herein.

ARTICLE VII<br>
PLANS AND SPECIFICATIONS

Section 7.1 - <u>Submission of Plans and Specifications</u> .

Tenant shall prepare, at its sole cost and expense, and in full compliance with the provisions of Exhibit C including, but not limited to, the sustainability provisions thereof, complete plans and specifications for all of Tenant's work, including storefront design, and shall submit such plans and specifications to Landlord or Landlord's designated representative for approval in accordance with the time periods set forth in Exhibit C. Tenant shall be required to submit its plans and specifications to Landlord in a timely manner so that Tenant's construction in the Premises shall be completed on or before the Rent Commencement Date.  No further material changes to said plans and specifications shall be made after such approval by Landlord without Landlord's prior written consent.  Landlord's written approval of any plans and specifications for Tenant's work shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws since it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws.

ARTICLE VIII<br>
USE

Section 8.1 - <u>Operation and Use of Premises</u>.

Tenant agrees to operate its business in the Premises under the trade name and in accordance with the permitted use specified in Article I and for no other business or purpose. Tenant further agrees not to conduct catalog sales or internet sales in or from the Premises, except of merchandise which Tenant is permitted to sell "over-the-counter" consistent with its permitted use.  Tenant recognizes that the specific limited use prescribed herein is a material consideration to Landlord in entering into this Lease.  Notwithstanding the foregoing, Tenant's specific limited use hereunder shall not be construed to imply that Tenant has an exclusive right to conduct the use permitted in Article I.

If Tenant's business in the Premises is to be conducted pursuant to a franchise agreement, the existence and continuation of such franchise agreement is a material consideration to Landlord in entering into this Lease, and if such franchise agreement is terminated, Landlord shall be entitled to treat such event as a Default under this Lease and elect any of the remedies provided in Article XXIII.

Section 8.2 - <u>Tenant's Covenant to Operate</u>.

Tenant agrees to complete Tenant's Work and open the Premises for business to the public fully fixtured, stocked and staffed on the Rent Commencement Date, and thereafter throughout the Term of this Lease to continuously operate in one hundred percent (100%) of the space within the Premises the permitted use prescribed in Article I, at least five (5) days a week during the live racing season at Gulfstream Park, and at least four (4) days a week during the non-live racing season at Gulfstream Park.  Tenant shall have no right to quit the Premises,

cease to operate its business, or cancel or terminate this Lease, unless such right is expressly granted to Tenant herein.

Section 8.3 - <u>Prohibitions on Use</u>.

(a) Tenant shall not use or permit or suffer the Premises, or any part thereof, to be used by anyone else or for any other business or purpose than that specifically defined and permitted by this Article VIII, and further provided, that Tenant shall not divert any portion of the Premises GLA for any other use other than the permitted use described above.

(b)    Tenant shall not permit the Premises to be used in violation of any Applicable Laws or in a manner which in the sole judgment of Landlord will injure the reputation of, be a nuisance or annoyance, or do damage to, the other tenants of the Shopping Center or Landlord, including, without limitation, the sale of patently offensive material and merchandise, or the committing of acts, which will disturb, impair or interfere with the use and enjoyment by other tenants of their respective premises within the Shopping Center or in the treatment of its customers that results in multiple complaints.

(c)    Tenant agrees not to use or allow the Premises to be used for any auction, fire, bankruptcy or "going out of business" sale unless ordered by a court of competent jurisdiction, after reasonable notice to Landlord and an opportunity by Landlord to be heard.

Section 8.4 - <u>Manner of Operation of Business</u>.

(a)    Tenant agrees that the above business is to be conducted in a reputable manner in keeping with good practices as established in the trade.  Tenant shall keep upon the Premises an adequate staff of employees and a full and complete stock of merchandise during business hours throughout the Term of this Lease so as to ensure a maximum volume of business in and from the Premises.

(b)    Subject to Section 14.1 of this Lease, Tenant agrees to assume full responsibility at its own cost to keep and maintain the Premises neat, clean, in proper repair and décor, free from waste and offensive odors, and in an orderly and sanitary condition, free of vermin, rodents, bugs and other pests.

(c)    For purposes of this Lease, the term "Hazardous Materials" shall mean any substances which are (i) defined under any Environmental Laws (as defined below) as a hazardous substance, hazardous waste, hazardous material, pollutant or contaminant; (ii) petroleum hydrocarbon, including crude oil, gasoline or diesel fuel, or any fraction thereof; (iii) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive, carcinogenic or a reproductive toxicant; or (iv) otherwise regulated pursuant to any Environmental Laws.  The term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements of all federal, state and local governmental agencies or other governmental authorities pertaining to the protection of human health and safety of the environment now existing or later adopted during the Term of this Lease.

Tenant shall not cause or permit any Hazardous Materials to be brought upon, kept, stored, utilized, disposed of or used in or about the Premises or Shopping Center by Tenant, its agents, employees, contractors or invitees.  This obligation shall survive the expiration or earlier termination of this Lease.  If Tenant breaches the obligations stated in the preceding sentence, or if the presence of Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in contamination of the Premises or Shopping Center, or if contamination of the Premises or Shopping Center by Hazardous Materials otherwise occurs for which Tenant is legally liable to Landlord for damages resulting therefrom, then in any of such events, Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, the cost of clean-up, diminution in value of the Premises or Shopping Center, damages for loss of or restriction on the use of rentable or usable space or of any amenity of the Premises or Shopping Center, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorney fees, consultant fees and expert fees) which arise during or after the Term of this Lease as a result of such contamination.  This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation and/or testing of site conditions or any clean-up, remediation, removal or restoration work required because of Hazardous Materials present in or on the Premises or Shopping Center.  Without limiting the foregoing, if the presence of any Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in any contamination of the Premises or Shopping Center, Tenant shall promptly take all actions at its sole expense as

are necessary to return the Premises or Shopping Center to the condition existing prior to the introduction of any such Hazardous Materials to the Premises or Shopping Center.

(d)     Landlord and its agents shall have the right, but not the duty, to inspect the Premises at any time upon reasonable notice to Tenant (except in the case of an emergency in which case no notice is needed) to determine whether Tenant is complying with the terms of this Lease.  If Tenant is not in compliance with any of the terms of this Lease, Landlord shall have the right, but not the obligation, to immediately enter upon the Premises to remedy said non-compliance at Tenant's expense.  Landlord shall use its reasonable efforts to minimize interference with Tenant's business, but shall not be liable for any interference caused thereby.

ARTICLE IX<br>TERM

Section 9.1 - Commencement Date Agreement.

At any time following full execution of this Lease, Landlord and Tenant may, upon written request to the other party, execute a supplemental agreement in a form for recording, setting forth the Rent Commencement Date and Term Expiration Date of the Term of this Lease.

Section 9.2 - Holding Over.

If, at the expiration of the Term of this Lease, Tenant continues to occupy the Premises with or without Landlord's consent, its tenancy shall become a month-to-month tenancy terminable by either party on thirty (30) days prior written notice to the other party.  Tenant's month-to-month tenancy shall be subject to all terms and conditions of this Lease, excepting the Term thereof, and Tenant shall be obligated to pay holdover  rent equal to one hundred fifty percent (150%) of the monthly  Rent payable by Tenant immediately prior to expiration of the Term, plus all other charges due under the Lease.  Tenant shall be further subject to any changes which Landlord has given Tenant, in writing, during any fifteen (15) day period for the following fifteen (15) day period.  Notwithstanding anything contained herein to the contrary, nothing contained in this Section 9.2 shall be deemed or construed to give Tenant the right to holdover.

Notwithstanding the foregoing, Tenant shall not be permitted to holdover if Landlord gives Tenant notice that Tenant may not holdover.

Section 9.3 - Expiration of the Term of the Lease.

(a)     This Lease shall expire on the Term Expiration Date without the necessity of any notice from either Landlord or Tenant to terminate same, and subject to Section 9.2 hereof, Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions under this Lease respecting the summary recovery of possession of the Premises from Tenant holding over to the same extent as if statutory notice had been given.

(b)     For a period of three (3) months prior to the expiration of the Term, upon reasonable prior notice to Tenant, Landlord shall have the right and may show the Premises and all parts thereof to prospective tenants during normal business hours.

(c)     Tenant shall deliver and surrender to Landlord possession of the Premises upon the Term Expiration Date or earlier termination of this Lease in as good condition and repair as the same shall be at the commencement of the Term of this Lease, except for ordinary wear and tear and casualty loss.

Section 9.4 - Renewal of Term.

.......... Tenant is hereby granted an option to extend the Term of this Lease (hereinafter "Original Lease") for one (1) additional period of five (5) year(s) (hereinafter "Renewal Term"), provided that Tenant shall notify Landlord, in writing, no less than six (6) months prior to the commencement of any such Renewal Term of Tenant's intention to exercise such option, and provided further that Tenant at the time of notice of renewal, as well as the commencement date of the Renewal Term, has fully complied with all terms and conditions of the Original Lease. The terms and conditions of the Renewal Term shall be the same as the terms and conditions of the Original Lease, excepting for the following modifications:

.......... (a)     Tenant shall have no further right of renewal after the expiration of the Renewal Term.

.......... (b)      The Rent payable during the Renewal Term shall be as set forth in Article I.

..........

## ARTICLE X
## RENT COMMENCEMENT DATE

Section 10.1 - <u>Rent Commencement Date</u>.

As used in this Lease, the term "Rent Commencement Date" or "RCD" shall be as defined in Article I.  Should the Rent Commencement Date occur on a day other than the first day of a calendar month, Tenant shall be liable for Rents due for said partial month on a prorated basis based upon a thirty (30) day month.

Section 10.2 – Intentionaly blank

Section 10.3 - <u>Tenant's Failure to be Open by the Outside Date</u>.

Notwithstanding the rights or remedies of Landlord set forth in Article XIII, in the event Tenant does not open for business in the Premises on or before the Outside Date, except for reasons within Landlord's or outside Tenant's control, Landlord shall have the right to require Tenant to pay to Landlord, as liquidated damages and not as a penalty, an amount equal to $50 for each day beyond the Outside Date that Tenant is not open for business; which payment is intended to compensate Landlord for actual and substantial losses that Landlord may suffer as a result of Tenant's not being open for business.  Nothing contained in this Section 10.3 shall be construed to waive any rights or remedies Landlord may have against Tenant, nor affect Tenant's obligation to commence payment of Rents on the Outside Date.  Landlord may offset any amounts payable by Tenant hereunder against any amounts Landlord may owe Tenant.

## ARTICLE XI
## RENT

Section 11.1 - <u>Rent</u>.

(a)      Tenant hereby covenants and agrees to pay to Landlord's authorized agent, at the address specified in Article I or at such other address as Landlord may, from time to time, designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, the Rent set forth in Article I; said amount(s) to be due and payable in monthly installments, in advance, on the first day of each and every calendar month.  Tenant agrees at no time to pay Rent more than one (1) month in advance of its due date.

(b)      Notwithstanding anything in this Lease to the contrary, in the event Tenant fails to pay any Rents or any other amount(s) due and owing Landlord within five (5) days following the due date of said Rents, then Tenant shall pay a late charge equal to two percent (2%) per month of such monthly Rents or amount(s) due Landlord from the due date of said Rents or amount(s) plus the maximum lawful interest rate on any such sums due Landlord from the due date to the date of payment of such sums.

Section 11.2 - <u>Percentage Rent</u>.

(a)      <u>Generally</u>.  For any month during which Tenant Gross Revenue exceeds $50,000, Tenant covenants and agrees to pay to Landlord's authorized agent, at the address set forth in Article I, or at such other address as Landlord may from time to time designate in writing, without deduction or set-off and without demand, an amount equal to ten percent (10%) of Gross Revenue in excess of $50,000, payable as set forth below.

(b)      <u>Payment</u>.

(i)      The Percentage Rent due for any month shall be payable by no later than the fifteenth (15th) day of the month immediately following the month in which Gross Revenue for the Lease Year exceeds $50,000, and shall be made concurrently with the submission of Tenant's written statement of monthly Gross Revenue to Landlord as set forth in subsection (e) below.

(ii)      Upon submission of Tenant's certified statement of Gross Revenue at the close of each Lease Year as provided herein, adjustments of amounts due for Percentage Rent shall be made to the respective parties.

(iii)     Notwithstanding the provision for the payment of Percentage Rent, Landlord shall not, in any event, be deemed to be a partner or associate of Tenant in the conduct of its business.  The relationship of the parties hereto shall, at all times, be solely that of Landlord and Tenant.

(c)   Gross Revenue.

The term "Gross Revenue" wherever used herein shall be defined to mean the total amount of all sales of merchandise and/or services and all other receipts of all business conducted in, at, or from any part of the Premises (including any sales made via personal computer located within the Premises, "Home Shopping" television sales, catalog, direct mail, telephone or electronic sales), whether the same be for cash, barter, credit, check, charge account, gift and merchandise certificates or other disposition of value regardless of collection, and whether made by Tenant, sub-tenants, concessionaires, licensees, or assignees of Tenant. The value of each sale shall be the actual total sales price charged to the customer, and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received.  Gross Revenue shall include orders or sales which originate in, at, or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, or telegraphed which are received at or filled from the Premises; and all sales and revenue accruing by means of mechanical, self-operated, or automatic vending devices if permitted on the Premises. Gross Revenue shall not include any non-ordinary course of business windfalls accruing to Tenant such as judgments on lawsuits and loan proceeds, or the sale of trade fixtures or of the business itself. There shall be no deductions or exclusions from Gross Revenue, except as specifically permitted hereafter.  Any deposit not refunded shall be included in Gross Revenue.

(d)   Exclusions from Gross Revenue.

Notwithstanding the foregoing, "Gross Revenue" shall not include:

(i)     Merchandise returned in the amount of cash refunded, credit given, or discounts or allowances granted or exchanges made, provided that the sale price of said items was originally included in Gross Revenue.

(ii)     The amount of any sales, use or gross receipts tax, or excise tax imposed by any governmental authority directly on sales and collected from customers, provided the amount of such tax is separately recorded.

(iii)     The exchange of merchandise between stores of Tenant when such exchanges are made solely for the operation of Tenant's business and not for the purpose of consummating a sale which has been made in, at or from the Premises.

(iv)     Merchandise returned for credit to shippers, jobbers, wholesalers or manufacturers.

(v)     intentionally blank

(vi)     Sums or credits received in settlement of claims for loss or damage to merchandise.

(vii)     Revenue from vending machines for Tenant's employees use only.

(e)   Reporting.

(i)     On or before the fifteenth (15th) day of each month of each Lease Year, commencing in the second month of the first Lease Year, Tenant shall furnish to Landlord's authorized agent at the address or fax number specified in Article I, or at such other address or fax number as Landlord may, from time to time, designate in writing, a written statement signed by Tenant showing Tenant's Gross Revenue, as herein defined, for the preceding calendar month.

(ii)     On or before the forty-fifth (45th) day following the close of each Lease Year, Tenant shall furnish to Landlord's authorized agent, at the address or fax number specified in Article I, a written statement certified by an officer of Tenant, or a certified public accountant employed by Tenant, of the Gross Revenue made in, at or from the Premises during the preceding Lease Year.

(iii)     For purposes of ascertaining the amount of reportable sales and revenue, Tenant agrees to record each and every sale at the time of the transaction (i) on a cash register having a sealed, continuous cash register tape with cumulative totals, which numbers, records and duplicates each transaction entered into the register (in any event such cash register must have a non-resettable grand total); or (ii) on serially pre-numbered sales slips; or (iii) using point-of-sale recording techniques; all of the above to be in accordance with generally accepted accounting principles, consistently applied.  Should Tenant elect (i) above, Tenant agrees that the continuous cash register tape will be sealed or locked in such a manner that it is not accessible to the person operating the cash register.  If Tenant chooses to record each sale on individual sales slips, Tenant agrees that said sales slips (including those canceled, voided or not used) will be retained in numerical sequence.

(iv)     If Tenant shall fail to prepare and/or deliver any statement of Gross Revenue required herein, Landlord may do any or both of the following:  (i) elect to treat Tenant's failure to report as a Default under this Lease; or (ii) elect to make an audit of all books and records of Tenant which in any way pertain to Gross Revenue and to prepare the statement(s) which Tenant has failed to prepare and deliver.  The statement(s) so prepared shall be conclusive on Tenant, and Tenant shall pay on demand all expenses of such audit and for the preparation of any such statement(s) and all sums as may be shown by such audit to be due as Percentage Rent.

(v)     Upon Landlord's written request, but no more frequently than once per calendar year, Tenant agrees to furnish Landlord an audited statement of Tenant's current financial condition.

(vi)     Tenant acknowledges that the Shopping Center is located within a community development district (the "CDD") created pursuant to Ordinance No. 2007-05 of the City of Hallandale Beach, Florida ("City"), authorized by the provisions of the Uniform Community Development District Act of 1980, Chapter 190, Florida Statutes in order to provide for, and to facilitate the financing, construction and completion of the public infrastructure ("Public Improvements") needed for the development of the Shopping Center. In consideration of the Public Improvements, Landlord has agreed to impose a user fee ("User Fee") in the amount of one-half (1/2) of one percent (0.5%) on all sales which occur in the Shopping Center. All retail and restaurant tenants located in the CDD are required to charge their customers the User Fee, to collect the User Fee from their customers and remit it to the Collecting Agent ("Collecting Agent") appointed pursuant to the provisions more specifically set forth in Exhibit D.

(vii)     All such monthly and annual statements and reports of Tenant's Gross Revenue shall be kept in confidence by Landlord, except in connection with a sale, mortgage, administrative or judicial proceedings.

(f)     <u>Books and Records</u>.

(i)     Tenant agrees to prepare and maintain for each Lease Year and to keep same at the Premises, or at its principal offices, accurate books and records of all business conducted at the Premises in accordance with generally accepted accounting principles consistently applied.  Said books and records shall be open and available to Landlord or Landlord's representative for examination at all reasonable times and upon reasonable notice to Tenant for the purpose of ascertaining or verifying Tenant's Gross Revenue.  Landlord shall also have the right to request such other records and/or accounts which Landlord may deem necessary to accurately determine Gross Revenue.  All books and records shall be retained by Tenant for examination by Landlord for a period of at least three (3) years following the end of the Lease Year for which said records apply.

(ii)     If upon inspection or examination of Tenant's books and records, Landlord determines that Tenant has failed to prepare and maintain the aforementioned books and records in the manner detailed herein, Landlord shall give Tenant sixty (60) days to cure said deficiencies and Tenant shall reimburse Landlord for all reasonable expenses incurred by Landlord in determining said deficiencies, including, but not limited to, any audit or examination fees incurred by Landlord.

If after receiving the aforesaid notice, and upon expiration of the sixty (60) day time period specified above, Tenant fails to cure the noted deficiencies, Landlord may, at its option, elect to do one or more of the following: (i) grant Tenant additional time to cure the deficiencies; or (ii) hold Tenant in Default of the Lease; or (iii) at Tenant's expense, retain a good and reputable independent accounting or bookkeeping firm to prepare the above-recited books and records.  If Landlord elects the latter option, Tenant agrees and covenants that the representative(s) of said accounting or bookkeeping firm will have full right of entry and access

to the Premises and existing financial records, and full cooperation by Tenant, for the purpose of establishing and maintaining the books and records recited hereinabove.  Any expenses incurred by Landlord in furtherance of its rights hereunder will be considered a part of Rents due and payable by Tenant with the next due installment(s) of Rents.

        (iii)    In the event an examination of Tenant's books and records shall disclose a deficiency in excess of two percent (2%) of the Gross Revenue reported for any Lease Year where Percentage Rent is due Landlord, Tenant agrees to pay to Landlord (1) the reasonable costs and expenses of such audit; and (2) any additional Percentage Rent found due and owing as a result of said audit, both of which shall be immediately paid by Tenant to Landlord upon demand.  If an examination by Landlord or its representative(s) discloses that Tenant has over-reported Gross Revenue, and that as a result of said over-reporting, Tenant has overpaid Percentage Rent, Landlord shall give Tenant credit against the next due installment(s) of Rents due and owing by Tenant for such overpaid Percentage Rent.

Section 11.3 - <u>Additional Rent</u>.  None

Section 11.4 - <u>Real Estate Taxes</u>.  None, except for the CDD Assessment

    (a)(i)    Assessments for on-site and/or off-site public improvements for the benefit of the Shopping Center, such as the CDD infrastructure improvement assessment in the fixed amount of One and 75/100 Dollars ($1.75) per square foot of Premises GLA per annum (the "CDD Assessment").  The CDD, or its authorized agent, shall bill Tenant directly for the CDD Assessment in monthly installments equal to one-twelfth (1/12th) of the annual CDD Assessment, and Tenant, as directed by such monthly CDD billing, shall remit the CDD Assessment directly to the CDD or its authorized agent.  Currently the only assessment is the CDD infrastructure improvement assessment.

    (b)    intentionally blank

    (c)    intentionally blank

Section 11.5 - <u>Utility and Insurance Costs</u>.    None

Section 11.6 – <u>Rent Sales Tax.</u>

    Pursuant to the provisions of Fla. Stat. §212.031 ("Fla. Tax Statute"), the Rents due and payable under this Lease are subject to a sales tax (currently six percent [6%]) ("Rents Sales Tax") which is to be paid by Tenant on such Rents.  The taxing authorities currently require that the Rents Sales Tax on Rents paid by Tenant be collected by Landlord and remitted to such taxing authorities on behalf of Tenant.  Accordingly, invoices for all Rents due and payable hereunder shall contain a Rents Sales Tax on the Rents and upon receipt of such Rents Sales Tax payment by Tenant, Landlord agrees to retain and remit such payment to the taxing authorities whenever due.

Section 11.7 - <u>Security Deposit</u>.

..........  Concurrently with its execution and submission of this Lease, Tenant shall deposit with Landlord and thereafter during the Term of the Lease shall maintain on deposit with Landlord, without interest, the security deposit set forth in Article I for the full, prompt and faithful performance by Tenant of all obligations hereunder.

..........  It is also agreed between the parties herein that:

..........  (a)    Such deposit or any portion thereof may be applied to the curing of any Default under the Lease that may exist, without prejudice to any other remedy or remedies which Landlord may have on account thereof, and upon such application, Tenant shall pay to Landlord on demand the amount so applied which shall be added to the security deposit so that same will be restored to its original amount;

..........  (b)    Should the Premises be transferred by Landlord, the security deposit or any balance thereof may be turned over to Landlord's successor or transferee, and Tenant agrees to look solely to such successor or transferee for such application or return; and

..........  (c)    Landlord or its successors shall not be obligated to hold the security deposit as a separate fund, but may commingle it with other funds; and

.......... (d)      If Tenant shall faithfully perform all of the covenants and agreements in this Lease contained on the part of Tenant to be performed, the security deposit, or any then remaining balance thereof, shall be returned to Tenant, without interest, within thirty (30) days after the Term Expiration Date.

ARTICLE XII
PREMISES UTILITY SERVICES

Section 12.1 - Utility Service Charges.

As part of the Rents provided for by this Lease, Tenant agrees to pay to Landlord, as hereinafter provided, the following utility service charges:

(a)      Water and Sewer Services.  Landlord has made  available water and sewer services to the Premises  on a direct-metered basis.

(b)      Telephone Service.  Per Exhibit C, Landlord will provide and/or make available to the Premises the facilities necessary to enable Tenant to obtain telephone service for the Premises.  Tenant shall arrange for telephone service directly with the appropriate company supplying same to the Shopping Center at Tenant's sole cost and expense and shall pay all charges therefor directly to the providing company.

(c)      Gas Service.  To the extent such service may be necessary for the conduct of Tenant's business in the Premises, and to the further extent that it is feasible to run such service from the nearest available gas service point to the Premises, Tenant shall, at Tenant's sole cost and expense, but subject to Landlord's prior approval, arrange for such gas service with the utility company supplying same to the Shopping Center, including, but not limited to, any piping from such service point and metering related thereto.  Tenant shall pay all charges therefor directly to the providing utility.

(d)      Electricity Service.  Landlord has advised Tenant of the utility company which will provide or is presently providing electricity service to the Shopping Center ("ESP").  Tenant shall arrange with such ESP to furnish and supply Tenant's electricity service requirements directly to Tenant on a direct-metered basis and Tenant shall pay all charges therefor directly to the ESP. In the event that Tenant wishes to utilize services of an alternative electric service provider ("ASP") rather than the ESP servicing the Shopping Center as of the date of Tenant's execution of this Lease, no such ASP shall be permitted to provide service to Tenant or to install its lines or other equipment within the Shopping Center without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  Unless all of the following conditions are met to Landlord's reasonable satisfaction in a written agreement between the ASP and Tenant or by any other means reasonably acceptable to Landlord, it shall be reasonable for Landlord to refuse its consent:

(i)      Landlord shall incur no expenses whatsoever with respect to any aspect of ASP's provision of its services, including, without limitation, the cost of installation, service and materials;

(ii)      Prior to commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall supply Landlord with verification that, in Landlord's sole judgment, ASP is (a) properly insured, and (b) financially capable of covering any uninsured damage;

(iii)      Prior to the commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall agree, in writing, to abide by such rules and regulations, including job site rules, and such other requirements as reasonably determined by Landlord to be necessary to protect the interest of the Shopping Center;

(iv)      Landlord reasonably determines that there is sufficient space in the Shopping Center for the placement of all of ASP's equipment and materials, including, without limitation, the electricity risers;

(v)      ASP is, in Landlord's sole judgment, licensed and reputable as shown in documents acceptable to Landlord;

(vi)      ASP agrees, in a license agreement signed by Landlord and ASP, to compensate Landlord the amount determined by Landlord for (a) space used in the Shopping Center for the storage and maintenance of ASP's equipment ("ASP's Space"), and (b) all costs

that may be incurred by Landlord in arranging for access by ASP's personnel, security for ASP's equipment, and any other such costs as Landlord may incur;

(vii)    ASP agrees that Landlord shall have the right to supervise ASP's performance of any work on or about the Shopping Center, including, without limitation, any installations or repairs; and

(viii)   ASP agrees that Landlord shall have the right to enter ASP's Space at any time in the event of an emergency and at all reasonable times and upon reasonable notice for the purpose of (a) inspecting same, (b) making repairs to ASP's Space and performing work therein as may be necessary, in Landlord's judgment, or (c) exhibiting ASP's Space for purposes of the sale or financing of the Shopping Center.

(e)    Heating, Ventilating and Air-Conditioning ("HVAC").

Tenant will be entitled to utilize the heating, ventilating and air-conditioning equipment currently used for the Premises ("Premises HVAC System") described in Exhibit C.  Tenant shall operate and maintain same during the Term of this Lease and such equipment shall belong to Landlord at the expiration or earlier termination of this Lease.      Such HVAC equipment will be adequate for a crowded nightclub operating in South Florida during summer months.

Section 12.2 – Intentionally blank

Section 12.3 – Intentionally blank


ARTICLE XIII
SIGNS

Section 13.1 – Storefront Sign.

Tenant shall only erect such storefront sign(s) that have been previously approved in writing by Landlord in accordance with Exhibit C and Applicable Laws, including obtaining all permits and licenses for same, and Tenant shall maintain said storefront sign(s) in good condition and repair.   Tenant shall not exhibit or affix any other type of sign, decal, advertisement, notice or other writing, awning, antenna or other projection to the roof or the outside walls or windows of the Premises or the building of which the Premises is a part without Landlord's written consent.  Notwithstanding the foregoing, Landlord authorizes Tenant to place signage, including via projection, near the first floor elevator that will service the Premises.

Section 13.2 - Interior Signs and Advertising.

Tenant agrees that no advertising material of any kind, except temporary price tags related to merchandise on display in the Premises, shall be placed within four feet (4') of any customer door or lease line of the Premises or on the surface of any display window(s) or customer door of the Premises.  All window display advertising material and interior signs shall be in keeping with the character and standards of the Shopping Center as determined by Landlord and as more specifically described in Exhibit C, and Landlord reserves the right to require Tenant to correct any nonconformity.  Any such display(s) and sign(s) shall only be related to merchandising of goods from the Premises.


ARTICLE XIV
REPAIRS AND ALTERATIONS

Section 14.1 - Repairs by Landlord.

(a)    Landlord shall keep the roof, structural portions, the exterior of the Premises, parking facilities and other Common Areas, and utility systems not exclusively serving the Premises in good and tenantable condition and repair during the Term of this Lease; provided, however, that if the need for any such repair(s) is attributable to, or results from the operation or acts of, Tenant or its agents, or is Tenant's responsibility pursuant to the terms of this Lease, then in such event, Tenant does hereby agree to, and shall reimburse Landlord for, all costs and expenses incurred by Landlord with respect to such repairs.

(b)    As used in this Article XIV, the phrase "structural portions" and "exterior of the Premises" shall not be deemed to include the Premises storefront(s), plate glass, window case(s), window frame(s), door(s), door frame(s) or any alterations to the Premises required to

comply with Applicable Laws.  It is expressly understood and agreed that Landlord shall be under no obligation to make any repairs, alterations, replacements or improvements to or upon the Premises resulting from compliance with the ADA.  Landlord confirms that to the best of its knowledge, the Premises are currently ADA compliant.

(c)    Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of Landlord unless (i) Tenant has previously notified Landlord in writing of the need for such repairs; (ii) Landlord has failed to commence said repairs within a reasonable period of time following receipt of Tenant's written notification; and (iii) Landlord has not thereafter diligently pursued said repairs to completion.

Section 14.2 - <u>Repairs By Tenant</u>.

It shall be Tenant's sole responsibility, at its own expense, to keep and maintain its storefront(s) and the interior of the Premises in good condition and repair at all times.  All repairs to the Premises, equipment or facilities therein or thereabout, other than those repairs required to be made by Landlord pursuant to Section 14.1, shall be made by Tenant.  Said repairs shall include, but not be limited to, all necessary painting and decorating, maintenance, repair and/or replacement of the electrical, plumbing, sewer and heating, ventilating and air-conditioning systems above  the slab and elsewhere which exclusively serve the Premises, and any other mechanical and operational installations exclusively serving the Premises.  All such repairs and replacements shall be made in a prompt manner so as to avoid creating additional damage and shall be in quality and class equal to the original construction.

Notwithstanding anything contained herein, Tenant shall, at Tenant's sole cost, repair or replace all glass contained in the Premises, including, but not limited to, all glass in doors, storefronts, windows and entrance and service doors.

Section 14.3 - <u>Alterations and Remodeling</u>.

(a)    Tenant, at its own expense, shall have the right to make such interior alterations, changes and improvements to the Premises as Tenant may deem reasonably necessary for its use of the Premises; provided, however, that any major remodeling of the interior of the Premises in excess of Ten Dollars ($10.00) per square foot of Premises GLA, and any material or structural alterations to the Premises or changes in the electrical, heating, plumbing or ventilating and air-conditioning systems thereof, or to any fire sprinklers, shall not be made without Landlord's prior written consent.  Landlord's approval of Tenant's alterations shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws as it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws.  All such alterations, changes and improvements shall be made in accordance with the provisions of Exhibit C and shall become the property of Landlord upon installation and shall remain upon and be surrendered with the Premises upon the expiration or earlier termination of this Lease.

(b)    Tenant further agrees not to make any alterations, additions or changes to any storefront sign, exterior wall or roof of the Premises, nor shall Tenant erect any mezzanines or increase the size of same if existing unless and until the prior written consent of Landlord shall first have been obtained.  In no event shall Tenant make or cause to be made any penetration through the roof or floor slab of the Premises without the prior written consent of Landlord.  Tenant shall be directly responsible for any and all damages resulting from any violation of the provisions of this Section 14.3.

ARTICLE XV<br>LIENS

Section 15.1 - <u>Lien Indemnification by Tenant</u>.

Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the specific performance of any labor or the furnishing of any materials or equipment for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises or the Shopping Center.

Tenant shall allow no liens to be filed against the Premises or the Shopping Center as a result of work performed at the request or on behalf of Tenant.  Tenant shall indemnify and save

harmless Landlord against all loss, liability, costs, attorney fees, damages and interest charges incurred as a result of any mechanic's lien or any other claim filed against the Shopping Center, the Premises, or Tenant's leasehold estate therein as a result of acts or omissions of Tenant or its agents, contractors and employees.

If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Premises or any part of the Shopping Center, Tenant shall, within thirty (30) days of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or other security acceptable to Landlord.  Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord for discharge of such lien.

ARTICLE XVI
INDEMNITY AND INSURANCE

Section 16.1 - Indemnification.

(a)     Tenant shall defend, indemnify and save Landlord harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees), in connection with loss of life, bodily or personal injury or property damage arising from or out of the acts, failures, omissions or negligence of Tenant, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Landlord, its respective agents, contractors or employees.

(b)     Landlord shall indemnify and save Tenant harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees) in connection with the loss of life, bodily or personal injury or property damages, arising from or out of the acts, failures, omissions or negligence of Landlord, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Tenant, its respective agents, contractors or employees.

Section 16.2 - Tenant's Insurance Requirements.

Tenant covenants and agrees that from and after the date that Landlord delivers possession of the Premises to Tenant, and continuing throughout the Term of this Lease or any renewal thereof, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, naming Tenant as an insured and Landlord and Ground Lessor as additional insureds, in the following amounts:

(a)     Commercial General Liability Insurance.  Tenant shall at all times keep and maintain in full force and effect commercial general liability insurance, which shall include broad form property damage liability coverage, extended bodily injury coverage, advertising injury liability coverage, contractual liability coverage and independent contractors  coverage, in an amount not less than Three Million Dollars ($3,000,000.00), adjusted annually for inflation, written on a combined single limit per occurrence basis for property damage, personal injury and bodily injury or death of one or more persons.

(b)     Worker's Compensation Insurance.  Tenant shall procure worker's compensation insurance as required by law, including employer's liability insurance (stop-gap), in an amount not less than One Million Dollars ($1,000,000.00).

(c)     Personal Property, Alterations, Improvements and Betterments.  Tenant shall at all times maintain in full force and effect special form insurance, including coverage for sprinkler damage, vandalism, and malicious mischief covering all of Tenant's personal property and alterations, improvements and betterments to the Premises, including plate glass, now existing or later added, to the extent of full replacement cost as updated from time to time during the Term of this Lease.  Tenant shall also procure business interruption insurance (loss of rents) for a period of not less than twelve (12) calendar months per occurrence.

The proceeds of Tenant's insurance, to the extent of the cost of any damage or loss to the Premises, shall be used for the repair and replacement of the property damaged or destroyed.  If Tenant fails to commence, within thirty (30) days of availability of such insurance proceeds, and to diligently proceed to reconstruct or repair its portion of the damaged or

destroyed Premises to its former condition prior to said casualty, then in such event, Landlord shall have the right to make all necessary repairs.  If the insurance proceeds described above are not sufficient to cover said repairs, Tenant shall be liable for all additional costs in excess of such available insurance proceeds.  However, it is expressly understood and agreed that Landlord shall be under no obligation to insure, reinstall, repair or replace any such alterations, additions, improvements or betterments.

(d)     Intentionally Blank     (e)     <u>Blanket Policies</u>.  Tenant may maintain any of its required insurance coverages under blanket policies of insurance covering the Premises hereunder and other property, provided that the minimum limits required herein are provided under such policies.

(f)     <u>Certificate(s) of Insurance</u>.  Tenant agrees to provide to Landlord certificate(s) of insurance with respect to the above-mentioned policies prior to occupancy and at least annually thereafter.  The coverage evidenced by such certificate(s) of insurance will be with insurance company(s) acceptable to Landlord, licensed to do business in the state where the Shopping Center is located, and rated at least A/X in the most current edition of Best's Insurance Report.  All such certificate(s) of insurance must provide that the required insurance coverage will be for a period of not less than one (1) year and must further provide that Landlord be given written notice at least thirty (30) days prior to any material alteration, expiration, cancellation, non-renewal or replacement of such existing insurance coverage.   Should Tenant fail to furnish any such notice or certificate(s) of insurance as provided hereunder, Landlord may obtain such insurance on behalf of Tenant and the premiums of same shall be deemed to be part of the Rents payable by Tenant to Landlord and Tenant shall reimburse Landlord for same  within ten (10) days following Tenant's receipt of an invoice therefor from Landlord.

(g)     <u>Notice of Loss</u>.  Tenant shall promptly notify Landlord forthwith in the event of any damage to property or injury to person(s) occurring on the Premises from fire, water, or any other casualty, and further shall take immediate action to mitigate further damage.

Section 16.3 - <u>Waiver of Subrogation</u>.

Notwithstanding anything to the contrary contained elsewhere in this Lease, or prohibited by law, neither Landlord, Ground Lessor nor Tenant shall be liable to the other party or parties or to any insurance company insuring the other party or parties by way of subrogated rights or otherwise, for any loss or damage caused by fire or any other hazard or peril covered by fire and extended coverage or special form insurance coverage, to the extent such loss or damage is covered by insurance to any building structure or other tangible property, or any resulting loss of income, even though such loss or damage may have been occasioned by the negligence of such party, or parties, or its agents or employees.

Section 16.4 - <u>Landlord Not Responsible for Acts of Others</u>.

Landlord shall not be responsible or liable to Tenant, or those claiming by, through or under Tenant, for any loss or damage to person(s) or property resulting from the acts or omissions of persons occupying space adjoining or adjacent to the Premises or connected to the Premises or any other part of the Shopping Center caused by, but not limited to, events such as the breaking or falling of electrical cables or wires, or the breaking, bursting, stoppage or leaking of water, gas, sewer or steam pipes or loss of HVAC.  None of the above events shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rents, or relieve Tenant from any of its obligations under this Lease.

<u>ARTICLE XVII</u>
<u>GENERAL PROVISIONS</u>

Section 17.1 - <u>Rules and Regulations</u>.

Landlord reserves the right, at any time and from time to time, to impose reasonable rules and regulations for the general welfare of the Shopping Center governing the conduct of tenants and the use thereof of the Common Areas for, without limitation, the avoidance of nuisance, and the maintenance of a good reputation, safety, order and cleanliness of the Premises and Shopping Center.  Tenant agrees to comply with such rules and regulations imposed by Landlord as if same had existed and been attached hereto at the time of execution of this Lease.

Section 17.2 - <u>Rubbish</u>.

Tenant agrees to maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash in containers permitted and/or required by Landlord.  Tenant, at its own expense, shall dispose of all said rubbish, garbage and trash as directed by Landlord.  In the event Tenant requires the services of a trash compactor, Tenant shall arrange for and coordinate said services through Landlord's Shopping Center manager.  If Tenant is required to use the Shopping Center's trash compactor services, the charge for such services shall be competitive with the prevailing market rate for same.

Section 17.3 - <u>Lighting</u>.

Tenant agrees to keep the windows of the Premises properly displayed and the Premises signs and external lights, where specifically permitted, properly illuminated during the hours of operation agreed to with Landlord pursuant to Section 8.2.

Section 17.4 - <u>Merchandise Display, Loading and Unloading</u>.

Tenant agrees not to display goods or merchandise outside the Premises, and to load, unload and/or deliver goods and merchandise only at such times and in such areas and through such entrances as shall be designated by Landlord.

Section 17.5 - <u>Obstruction of Passageways</u>.

Tenant agrees not to obstruct any passageways, driveways, approachways, walks, roadways, exits or entrances in, to, from or through the Common Areas or any other portion of the Shopping Center.

Section 17.6 - <u>Employee Parking</u>.

Tenant and its employees shall park their vehicles in areas designated for such purpose by Landlord.    Tenant agrees to notify its employees in writing of the provisions of this Section 17.6.

<u>ARTICLE XVIII</u>
<u>SUBORDINATION AND ATTORNMENT BY TENANT</u>

Section 18.1 - <u>Subordination of Lease</u>.

This Lease and the estate of Tenant hereunder shall be subject and subordinate to the Ground Lease, any deed of trust, mortgage lien or charge ("Mortgage") and any reciprocal easement agreement or other operating agreement or easement ("REA") which may now encumber or which at any time hereafter may encumber all or any portion of the Shopping Center (such Mortgage and REA and any replacement, renewal, modification, consolidation or extension thereof is collectively "Encumbrance").   Any Encumbrance shall be prior and paramount to this Lease and to the right of Tenant hereunder and all persons claiming through and under Tenant, or otherwise, in the Premises.  Tenant's acknowledgement and agreement of subordination provided for in this Section 18.1 shall be self-operative, and no further instrument of subordination shall be required.  However, Tenant covenants and agrees that, from time to time and at the request of Landlord or at the request of the holder of any Encumbrance, it will execute and deliver any  instruments or certificates reasonably necessary to subordinate the Lease to such Encumbrance(s) or acknowledge or confirm the priority of any Encumbrance over this Lease or to evidence Tenant's consent to an Encumbrance; the instrument subordinating the Lease to any Mortgage shall be in the lender's customary form.   Notwithstanding the foregoing, any holder of an Encumbrance may elect that this Lease shall have priority over such Encumbrance, and upon notification of such election by the holder of such Encumbrance, this Lease shall be deemed to have priority over such Encumbrance, whether this Lease is dated prior to or subsequent to the date of such Encumbrance.

Section 18.2 - <u>Attornment by Tenant</u>.

Tenant agrees that if the holder of any Encumbrance or any person claiming under said Encumbrance shall succeed to the interest of Landlord in this Lease, or in the event any ground lease is terminated, Tenant shall recognize and attorn to the successor holder as Landlord under the terms of this Lease.  Tenant agrees that it will, upon the request of Landlord, execute, acknowledge and deliver any and all instruments necessary or desirable to give effect or notice of such attornment and failure of Tenant to execute any such document or instrument on

demand shall constitute a Default by Tenant under the terms of this Lease.  In the event of any action for the foreclosure of the Mortgage, or in the event of the termination or expiration of any ground lease, this Lease shall not terminate or be terminable by Tenant hereunder by reason of such foreclosure of the Mortgage or termination of any such ground lease unless Tenant is specifically named and joined in any such action and unless a judgment is obtained therein against Tenant.

ARTICLE XIX
RIGHTS OF LANDLORD

Section 19.1 - Landlord's Right to Repair.

 Landlord, or its authorized agent(s), after reasonable prior written notice to Tenant, may go upon and inspect the Premises or any portion of the Shopping Center, and if Tenant has failed to commence any repairs required to be made by Tenant pursuant to the terms of this Lease within ten (10) days following receipt of written notice from Landlord, Landlord may, at its option, cause such repairs to be performed which are Tenant's obligation to perform and which Tenant has failed to do.  Said work performed by Landlord shall be chargeable to Tenant and shall be due and payable to Landlord within ten (10) days following receipt of Landlord's billing.

Section 19.2 - Landlord's Right to Affix to Exterior.

 Landlord shall have the right to install or place upon, or affix to, the roof and exterior wall(s) of the Premises, mechanical, electrical or other equipment, non-competitive signs, displays, antennas, satellite dishes, and any other objects or structures, provided same shall not materially impair the structural integrity of the building or interfere with Tenant's occupancy. Landlord currently has no plans to do any of the aforementioned actions.

Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant.

 Landlord shall have the right, but not the obligation, to make payments on behalf of Tenant where Tenant is in Default thereof under the terms of this Lease.  Said payments by Landlord shall be considered part of Rents and shall be due and payable by Tenant within ten (10) days following Tenant's receipt of Landlord's billing therefor.

ARTICLE XX
ASSIGNMENT AND SUBLETTING

Section 20.1 - Landlord's Consent Required.

 (a) Landlord has entered into this Lease with Tenant in order to obtain the benefit for the Shopping Center of the unique attraction of Tenant's trade name set forth in Article I and of the unique merchandising mix and product line associated with the business operated by Tenant under such trade name.  In entering into this Lease, Landlord has specifically relied on the identity and special skill of Tenant in its ability to conduct the business identified in Article I. Accordingly, Tenant shall not mortgage, pledge, encumber, franchise, assign or in any other manner transfer this Lease, voluntarily or involuntarily, by operation of law or otherwise, nor sublet all or any part of the Premises for the conduct of any business by a third person or business entity, or for any purpose other than expressly authorized herein without Landlord's prior written consent.

 (b) Any consent by Landlord to any assignment or subletting of the Premises, or other operation by a concessionaire or licensee, shall not constitute a waiver of the necessity for such consent under any subsequent assignment or subletting or operation by a concessionaire or licensee.

 (c) Reference anywhere else in this Lease to any assignee or subtenant shall not be considered as a consent by Landlord to such assignment or subletting nor as a waiver against same, except if specifically permitted otherwise in this Article XX.

Section 20.2 - Insolvency Proceedings.

 In the event an assignment of the Premises is caused by operation of law due to Tenant's voluntary or involuntary insolvency proceedings under the Bankruptcy Reform Act of 1978, as amended, said assignment shall be subject to any and all conditions contained in Section 365 of said act or any other section pertaining to the termination, assumption, assignment or rejection of executory contracts for leases.

Section 20.3 - <u>Transfer of Corporate Shares</u>.

In the event Tenant is a "closely-held" corporation (meaning a corporation which is not listed on a national securities exchange as defined in the Securities Exchange Act of 1934, as amended), a change in the "control" of Tenant ("control" meaning the ownership or control of more than fifty percent [50%] of Tenant's stock) without Landlord's prior written consent shall constitute an assignment in violation of this Lease, and Landlord shall, at Landlord's election, be entitled to deem Tenant in Default under this Lease.

Section 20.4 - <u>Assignment to Related Entity</u>.

Notwithstanding the foregoing provisions, Tenant shall have the right to assign or otherwise transfer this Lease or to sublet the Premises to any (x) parent corporation of Tenant; or (y) wholly owned subsidiary of Tenant; or (z) corporation which is wholly owned by the same corporation which wholly owns Tenant; provided, however, that in any of such events (i) Tenant shall remain primarily liable for all obligations under this Lease; (ii) the transferee shall, prior to the effective date of the transfer, deliver to Landlord instruments, in written form acceptable to Landlord, evidencing such transfer and its agreement to assume and be bound by all terms, conditions and covenants of this Lease to be performed by Tenant; (iii) Tenant shall not be in Default under any provisions of this Lease; and (iv) Tenant's right to make such transfer is expressly conditioned on and shall remain in effect only as long as the transferee maintains its relationship as a parent corporation or wholly owned subsidiary of Tenant or wholly owned subsidiary of Tenant's parent corporation.  Any transfer of the stock of such parent or subsidiary transferee shall be deemed a change in the control of Tenant and governed by the provisions of Section 20.3 above, unless such parent corporation or subsidiary transferee is not a closely-held corporation.

Section 20.5 - <u>Transfer of Other Business Interests</u>.

If Tenant is a general or limited partnership, or is a limited liability company, or any other type of business entity other than a corporation, and if at any time during the Term hereof, the person(s) who at the time of the execution of this Lease owns the general partners' interest in such limited partnership or owns a controlling partnership interest in such general partnership, or is the managing member of the limited liability company, or a majority shareholder of any other business entity other than a corporation, ceases to own such interest, such cessation of ownership shall constitute an assignment of this Lease (except as a result of transfers by bequests or inheritance).

Section 20.6 - <u>Acceptance of Rents by Landlord</u>.

If this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by a third party, other than Tenant, with or without Landlord's consent, Landlord may collect from such assignee, subtenant or occupant, any Rents or other charges payable by Tenant under this Lease and apply the amount collected to Rents herein reserved, but such collection by Landlord shall not be deemed a waiver of any provisions of this Lease, nor acceptance of said assignee, subtenant or occupant as a tenant of the Premises.

Section 20.7 - <u>No Release of Liability</u>.

No assignment of this Lease or subletting of the Premises or any other transfer by Tenant, either with or without Landlord's consent, required or otherwise, during the Term of this Lease shall release Tenant or Guarantor(s) (if any) from any liability under the terms of this Lease nor shall Tenant or Guarantor(s) (if any) be relieved of the obligation of performing any of the terms, covenants and conditions of this Lease.

Section 20.8 - <u>Administrative Fee</u>.

Tenant shall pay Landlord an administrative fee of One Thousand Dollars ($1,000.00) in order to compensate Landlord for the time and expense of reviewing, processing and documenting Tenant's request that Landlord consent to any proposed assignment or subletting. Such processing fee shall be paid to Landlord at the time that Tenant requests Landlord's consent hereunder and shall be payable to Landlord whether or not Landlord consents to Tenant's request and whether or not  said proposed assignment or subletting actually occurs.

<u>ARTICLE XXI</u>
<u>DAMAGE OR DESTRUCTION</u>

Section 21.1 - <u>Landlord's Obligation to Repair and Reconstruct</u>.

(a)    If the Premises shall be partially damaged by fire or other casualty insurable under standard special form insurance but are not thereby rendered untenantable in any manner, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall not be abated.  If by reason of such occurrence, the Premises shall be rendered untenantable only in part, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall be abated proportionately as to the portion of the Premises rendered untenantable until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(b)    If the Premises shall be rendered wholly untenantable by reason of such occurrence and the remainder of the Term of the Lease is two (2) years or more, Landlord shall cause the Premises to be repaired in accordance with subsection (c) below (subject to reasonable delays occasioned by adjustment of losses with insurance carriers or for any other cause beyond Landlord's control), and Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(c)    If Landlord is required or elects to repair or reconstruct the Premises under the provisions of this Article XXI, its obligation shall be limited to restoring the Premises to the condition it was in after Tenant's  leasehold improvement work was completed.  Tenant, at Tenant's expense, shall promptly perform all repairs and restoration not required to be done by Landlord herein and shall promptly re-fixture and reconstruct the Premises and recommence business in all parts thereof.

(d)    Tenant shall not be entitled to any compensation or damages, other than stated herein, from Landlord for the loss of use of the whole or any part of the Premises or damage to Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

Section 21.2 - <u>Landlord's Option to Terminate</u>.

Landlord may elect to terminate this Lease if (i) the Premises are rendered wholly untenantable or damaged as a result of any cause which is not covered by Landlord's insurance; or (ii) the Premises are damaged or destroyed in whole or in substantial part during the last two (2) years of the Term hereunder; or (iii) the Shopping Center is damaged to the extent of fifty percent (50%) or more of the gross leasable area thereof.  In any of the above events, Landlord shall give Tenant notice of its election to terminate the Lease pursuant to the above within ninety (90) days after the occurrence of the applicable event.  If such notice is given, the Lease shall terminate as of the date of such notice, and Rents shall be adjusted as of the date of such termination.

Section 21.3 - <u>Demolition of Landlord's Building</u>.

If the Shopping Center is so substantially damaged that it is necessary, in Landlord's reasonable judgment, to demolish all or a substantial portion of the Shopping Center, including the Premises, for the purpose of reconstruction, then upon the date such demolition of the Premises commences, Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so restored has re-opened for business.

<u>ARTICLE XXII</u>
<u>CONDEMNATION</u>

Section 22.1 - <u>Effect of Taking</u>.

(a)    In the event that the whole or any part of the Premises shall be taken for public or quasi-public use or condemnation under eminent domain, this Lease shall terminate as to the part so taken on the date possession is yielded to the condemning authority.

(b)    In the event that any portion of the Shopping Center or Common Areas is taken, and such taking substantially impairs access to, or the usefulness of, the Premises for the purposes hereinbefore granted to Tenant, either party may terminate the Lease by written notice to the other party given within thirty (30) days prior to the actual physical taking.

(c)     For purposes of this Article XXII, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

(d)     If this Lease is not terminated as above provided following any of such actual takings, then Landlord shall, at its expense, make all necessary repairs or alterations to the basic building and exterior work so as to constitute the remaining Premises a complete architectural unit and a proportionate allowance shall be made in Rents based on the proportion of the Premises remaining as compared to the original Premises.

Section 22.2 - <u>Compensation and Awards</u>.

All compensation awarded for any taking of the fee and the leasehold, or any part thereof, shall belong to and be the property of Landlord.  Tenant hereby assigns to Landlord all right, title and interest of Tenant in and to any award made for leasehold damages and/or diminution in the value of Tenant's leasehold estate.  Tenant shall have the right to claim such compensation as may be separately awarded or allocated by reason of the cost or loss to which Tenant might be put in removing Tenant's merchandise, fixtures, leasehold improvements and equipment.  Compensation as used in this Section shall mean any award given to Landlord for such taking in excess of, and free and clear of, all prior claims of the holders of any mortgages or other security interests.

Section 22.3 - <u>Condemnation or Breach of Lease</u>.

Any such appropriation or condemnation proceedings shall not operate as, or be deemed an eviction of, Tenant or a breach of Landlord's covenant of quiet enjoyment.

Tenant hereby waives any statutory rights of termination which may arise by reason of any partial taking of the Premises under the power of eminent domain.

ARTICLE XXIII<br>DEFAULT

Section 23.1 - <u>Default</u>.

This Lease is made upon the condition that Tenant punctually and faithfully perform all of the covenants and agreements to be performed by Tenant as herein set forth and the occurrence of any of the following shall constitute a breach of this Lease by Tenant if not cured within ten (10) days after receipt of written notice thereof from Landlord ("Default"):

(a)     Any item comprising Rents required to be paid by Tenant remaining in arrears and unpaid for ten (10) calendar days after receipt of written notice thereof from Landlord.

(b)     If Tenant or any related or affiliated entity shall be a party to any other lease(s) with Landlord for space(s) in the Shopping Center, and there shall exist a Default in either this Lease or in any of said other lease(s), such Default shall be deemed a Default under all such leases with Landlord, pursuant to which Landlord may take appropriate action hereunder.

(c)     Subject to Section 365 of the Bankruptcy Reform Act of 1978, as amended, if there is a filing of a petition proposing the adjudication of Tenant or any Guarantor of Tenant's obligations hereunder as bankrupt and/or insolvent or if there is a reorganization of Tenant or Guarantor(s) (if any) or an arrangement by Tenant or Guarantor(s) (if any) with its creditors, whether pursuant to the Federal Bankruptcy Act or any similar federal or state proceeding, and such action is not dismissed within sixty (60) days after the date of filing.

(d)     Any sale of Tenant's interest in the Premises under an attachment, execution or similar legal process or pursuant to an unauthorized assignment of this Lease.

(e)     Any making by Tenant or Guarantor(s) (if any) of an assignment for the benefit of creditors.

(f)     If Tenant shall vacate or abandon the Premises or shall fail to operate its business in accordance with the days and hours required herein, or fails to continuously occupy and conduct Tenant's business in the Premises.

(g)     Any failure by Tenant to remove any lien or notice of lien on account of an alleged debt of Tenant within the time period provided for in Section 15.1

(h)     With the exception of items (a) through (g) above, a failure by Tenant to observe or perform any other covenant, term, condition, provision, rule or regulation of this Lease on the part of Tenant to be kept or performed and such failure shall continue for a period of twenty (20) calendar days or more after written notice thereof given to Tenant by Landlord (excepting any such failure that cannot reasonably be cured within said twenty (20) calendar day period, provided that Tenant, within said twenty (20) calendar day period, has promptly commenced to proceed with diligence and in good faith to remedy such failure).

Section 23.2 - <u>Remedies and Damages</u>.

(a)     If a Default occurs, Landlord may, at its option, and in addition to any and all other rights and remedies provided Landlord in this Lease or at law or in equity, immediately or at any time thereafter and without demand or notice (except as provided herein):

(i)     Apply all or part of the security deposit, if any, to cure such Default, without waiving the Default, and Tenant shall, on demand, restore the security deposit to its original amount; or

(ii)     Apply any overpayment of Rents to curing such Default, without waiving the Default,  in lieu of refunding or crediting same to Tenant; or

(iii)     If the Default pertains to work or other obligations (other than the payment of Rents) to be performed by Tenant, without waiving such Default, enter upon the Premises and perform such work or other obligation, or cause such work or other obligation to be performed, for the account of Tenant, and Tenant shall, on demand, pay to Landlord the cost of performing such work or other obligation plus fifteen percent (15%) thereof for Landlord's administrative costs; or

(iv)     Terminate this Lease by written notice to Tenant.

(b)     Notwithstanding any termination of this Lease or termination of Tenant's rights to possession, whether by summary proceedings or otherwise, Tenant shall pay and be liable for (on the days originally fixed herein for payment thereof) all Rents as if this Lease had not been terminated, whether the Premises are relet or remain vacant in whole or in part.  However, in the event the Premises are relet by Landlord, Tenant shall be entitled to a credit in the net sum of Rents received by Landlord in such reletting after deduction of all expenses incurred in reletting the Premises and in collecting such Rents.

(c)     In the event of a reletting, Landlord may apply the rent therefrom first to the payment of Landlord's reasonable expenses, including, but not limited to, attorney fees incurred, expenses attributable to reletting, repairs, brokerage fees, subdividing, renovation or alteration of the Premises and then to the payment of Rents and other sums due from Tenant hereunder, and Tenant shall remain liable for any deficiency thereof.

(d)     In computing damages or Rents due under this Lease, the value of Percentage Rent for any period subsequent to the termination of this Lease or the termination of Tenant's right of possession thereof shall be included and shall be an amount per year equal to one-third (1/3) of the total Percentage Rent chargeable to Tenant for the last three (3) full Lease Years immediately preceding such termination, and if less than three (3) full Lease Years shall have elapsed, such value shall be an amount per Lease Year equal to the average yearly Percentage Rent theretofore chargeable to Tenant.

(e)     In the event of a Default by either party hereto,  the defaulting party will be liable to the non-defaulting party  for all court costs and reasonable attorney fees incurred by the non-defaulting party  in enforcing its rights and remedies under this Lease, including, without limitation, all costs and fees incurred in connection with obtaining possession of the Premises or in the enforcement of any covenant, condition or agreement herein contained, whether through legal proceedings or otherwise and whether or
not any such legal proceedings are prosecuted to a final judgment.

Section 23.3 – Intentionally Blank

Section 23.4 - <u>Repeated Default</u>.

(a)     Notwithstanding anything to the contrary set forth in this Lease, if Tenant shall be in Default in the timely payment of any Rents due Landlord from Tenant, or the payment of any other charges due Landlord from Tenant under the terms of this Lease, or in the timely reporting of Gross Revenue as required by Section 11.2 of this Lease, and any such Default shall be repeated two (2) times in any period of twelve (12) consecutive months, then, notwithstanding that such Default shall have been cured within the period after notice as provided in this Lease, any further similar Default within said twelve (12) month period shall be deemed to be a "Repeated Default".

(b)     In the event of a Repeated Default, Landlord may, in addition to any other rights and remedies provided Landlord in this Lease or at law or in equity, and without notice to Tenant and without affording Tenant an opportunity to cure such Repeated Default, terminate this Lease forthwith.

Section 23.5 - Waiver of Rights of Redemption.

Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Applicable Laws in the event that Tenant is in the process of being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of a violation by Tenant of any of the covenants or conditions of this Lease or otherwise.


ARTICLE XXIV
COMPETITION

Intentionally Blank


ARTICLE XXV
NOTICES

Section 25.1 - Notices to Tenant and Landlord.

Any notice or consent required to be given to, by, or on behalf of either party, shall be in writing and shall be given by mailing such notice or consent by registered or certified mail, return receipt requested, or by a nationally recognized overnight courier which provides written evidence of delivery, addressed to Landlord at Landlord's notice address set forth in Article I, and to Tenant at Tenant's notice address set forth in Article I, and either party may, by written notice similarly given, designate a substitute address at any time hereafter.  Any such written notice shall be deemed given when mailed as in this Section 25.1 provided, or delivered personally to the parties hereto or to their authorized agents and/or officers.  Rejection, refusal, failure to accept, or the inability to deliver any written notice sent hereunder shall be deemed to be receipt of such notice, demand or request.


ARTICLE XXVI
MISCELLANEOUS

Section 26.1 - Accord and Satisfaction.

No payment by Tenant or receipt by Landlord of a lesser amount than the Rents herein stipulated shall be deemed to be other than on account of the earliest stipulated Rents, nor shall any endorsement or statement on any check or letter accompanying the payment of any Rents be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rents or pursue any other remedy provided for in this Lease or available at law or in equity.

Section 26.2 - Complete Agreement.

The parties hereto acknowledge that all of the terms and covenants contained herein were reviewed by both parties and/or their legal counsel, and all negotiations, consideration, representations, inducement and understandings between the parties are incorporated herein and may be modified or altered only by agreement, in writing, between the parties.  This Lease contains the entire agreement between the parties hereto, and no agent, representative, employee or officer of Landlord has authority to make, or has made, any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth.  No present or past dealings or customs between the parties shall be permitted to contradict or modify the terms hereof.

Section 26.3 - <u>Consents</u>.

Neither Landlord nor Tenant shall unreasonably withhold approval or consent when required from either party under the terms of this Lease (except where otherwise stated herein); provided, however, that Landlord shall not be deemed to have unreasonably withheld such approval or consent if its mortgagee shall refuse to permit Landlord to grant such consent.

Section 26.4 - <u>Brokerage</u>.

Tenant warrants that it has had no dealings with any broker or agent in connection with this Lease, or in the event Tenant has had any such dealings, Tenant covenants and agrees to pay, hold harmless and indemnify Landlord from and against any and all costs, expenses or liability for any compensation, commissions or charges claimed by any broker or agent with respect to this Lease or negotiation hereof (including, without limitation, the cost of legal fees in connection therewith).

Section 26.5 - <u>Effective Date of Lease</u>.

Submission of this Lease by Landlord for examination or execution by Tenant does not constitute a reservation of, nor option for, Lease and this instrument shall not become effective as a lease or otherwise until execution by, and delivery to, both Landlord and Tenant.  This Lease shall only become effective and binding upon the parties in establishing the relationship of Landlord and Tenant as of the date first written above, but not earlier than the date Landlord executes this Lease.

Section 26.6 - <u>Estoppel Certificates</u>.

Tenant agrees at any time and from time to time, within fifteen (15) days after receipt of written request from Landlord, to execute, acknowledge and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications, or unless Landlord is in default, in which case Tenant must describe the default), the dates to which Rents have been paid pursuant to this Lease, and such other certification concerning the Lease as may be reasonably required by Landlord or Landlord's mortgagee. Tenant further agrees that said statement may be relied upon by any prospective purchaser of the fee or mortgagee or assignee of any mortgage on the fee of the Premises.

Section 26.7 - <u>Force Majeure</u>.

Landlord and/or Tenant shall be excused for the period of delay in the performance of any of their respective obligations hereunder, except their obligation to pay any sums of money due under the terms of this Lease, and shall not be considered in Default of this Lease when prevented from so performing by cause(s) beyond Landlord's or Tenant's control, including, but not limited to, civil commotion, war, fire or other casualty, governmental regulations, statutes, ordinances, restrictions or decrees, or through acts of God.

Section 26.8 - <u>Interpretation</u>.

The laws of the State (or Commonwealth) in which the Shopping Center is located shall govern the validity, performance and enforcement of this Lease.  If any provision of this Lease shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not be deemed to affect or impair any other provisions hereunder.

Section 26.9 - <u>Memorandum of Lease</u>.

This Lease shall not be recorded, but either party may record a Memorandum of Lease describing the Premises herein demised, the Term of this Lease and renewal rights, if any, and referring to this Lease.  The party requesting that the Memorandum of Lease be recorded shall prepare and pay all costs of preparation and recording of the Memorandum of Lease and the other party agrees to execute such instruments as may be reasonably required for such recording.  Tenant shall execute such documents as Landlord may require, in recordable form, upon the expiration or earlier termination of the Term of this Lease in order to remove the Memorandum of Lease from record.

Section 26.10 - <u>Quiet Enjoyment</u>.

Subject to the terms and conditions of this Lease and to any Encumbrances to which this Lease is subordinate pursuant to Section 18.1 herein, Landlord hereby covenants and

agrees that if Tenant shall faithfully perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall, at all times during the continuance hereof, have the peaceful and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person(s) lawfully claiming the Premises, save and except in the event of the taking of the Premises by public or quasi-public authority as hereinbefore provided.

Section 26.11 - Rent Demand.

Every demand for Rents due wherever and whenever made shall have the same effect as if made at the time it falls due and at the place of payment, and after the service of any notice or commencement of any suit or final judgment therein, Landlord may receive and collect any Rents due, and such collection or receipt shall not operate as a waiver of, nor affect, such notice, suit or judgment.

Section 26.12 - Section and Title Headings.

The section and title headings contained herein are for convenience purposes only and do not define, limit, construe or amplify the contents of any such sections.

Section 26.13 - Successors and Assigns.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

Section 26.14 - Waiver.

(a)    Landlord and Tenant shall each have the right at all times to enforce the covenants, conditions and legal rights and remedies of this Lease in strict accordance with the terms hereof, notwithstanding any conduct or custom(s) on the part of Landlord or Tenant in refraining from so doing at any time(s).  No failure by either party hereto to insist upon the strict performance of any term or condition of this Lease, no failure by either party hereto to exercise any right or remedy available, legal or equitable, for a breach thereof, and no acceptance by Landlord of full or partial Rents during the continuance of any such breach shall constitute a waiver by such party of any such breach, term, condition or right.

(b)    No term or condition of this Lease required to be performed by Landlord or Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by the waiving party.

(c)    A waiver by Landlord with respect to any tenant of the Shopping Center shall not constitute a waiver in favor of any other tenant, nor shall the waiver of any breach or condition be claimed if pleaded to excuse a future breach of the same condition or covenant or any other condition, covenant, provision, rule or regulation of this Lease.

Section 26.15 - Exculpation.

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and as a consequence of such failure, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from the Shopping Center received by Landlord. Neither Landlord nor any partners, beneficiaries, officers, directors, members, joint venturers, shareholders or affiliated entities of Landlord shall be personally liable for any deficiency.

Section 26.16 - Transfer of Landlord's Interest.

Landlord shall be liable under this Lease only while owner of the Shopping Center.  If Landlord should sell or otherwise transfer Landlord's interest in the Shopping Center, and if such purchaser or transferee assumes Landlord's obligations hereunder, then such purchaser or transferee shall be responsible for all covenants and undertakings thereafter accruing to Landlord.  Tenant agrees that after such sale or transfer of Landlord's interest, Landlord shall have no liability to Tenant under this Lease or any modification(s), amendment(s), extension(s) or renewal(s) thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of Landlord's interest to such purchaser or transferee.

Section 26.17 - Litigation.

(a)      Any claim, demand, right or defense of any kind by a party hereto  which is based upon, or arises in connection with, this Lease or the negotiations thereof prior to execution of same, including, but not limited to, adjustments to Landlord's billings, shall be barred unless the complaining party  seeks an adjustment, commences an action thereon, or interposes a defense by reason thereof, within the applicable statute of limitations.

(b)      To the extent permitted by law, Landlord and Tenant each hereby waives all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Premises.

(c)      If either party hereto be made, or becomes a party to, any litigation commenced by or against the other party involving the enforcement of: (i) any Applicable Laws against such other party; or (ii) any rights or remedies of such party hereunder, then in either of such events, the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorney fees incurred by such party in said litigation.

(d)      Any litigation commenced by Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the Premises, shall be brought only in the courts of the State (or Commonwealth) in which the Premises is located and the parties hereby consent to the jurisdiction of said courts.

Section 26.18 –  Patriot Act.

Tenant hereby  represents, covenants and warrants to Landlord that: (i) Tenant  (which, for the purpose of this certification, includes its partners, members, principal shareholders, except for those who are members of the public who hold Tenant's stock), to the best of its knowledge, is not in violation of any laws, executive orders or regulations relating to terrorism or money laundering, including Executive Order No. 13224 – Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001 (the  "Executive Order") and/or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOTACT) of 2001 (Public  Law 107 56) (the "USA Patriot Act"), enacted October 26, 2001, as amended, and Tenant has not been designated as a "Specially Designated National and Blocked Person" or other banned or blocked person, entity, nation, or transaction pursuant to the Executive Order, the Patriot Act or any other law, order, rule, or regulation; (ii) Tenant is currently in compliance with and will at all  times during the Term of this Lease (including any extension thereof) remain in compliance with the Executive Order, the USA Patriot Act and regulations of the Office of Foreign Assets Control of the United States Department of the Treasury, and any statute, executive  order and other governmental action relating thereto; and (iii) Tenant is not engaged in this transaction, directly or indirectly on  behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.



IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written hereinabove.

LANDLORD:

THE VILLAGE AT GULFSTREAM PARK, LLC., a Delaware limited liability company

By: _____
Tim Ritvo
Chief Operating Officer

STATE OF FLORIDA )
                 ) SS:
COUNTY OF BROWARD )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named THE VILLAGE AT GULFSTREAM PARK, LLC, a Delaware limited liability company, by Tim Ritvo, its Chief Operating Officer, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of said limited liability company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 13th day of _December_, 2012.

_____
Notary Public

CYNTHIA VASQUEZ
Notary Public - State of Florida
My Comm. Expires Jan 19, 2015
Commission # EE 56413
Bonded Through National Notary Assn.

TENANT:

By: _____

Its: _____MGM_____

STATE OF _Florida_ )
                   ) SS:
COUNTY OF _Broward_ )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named Club Sinz, LLC, a Florida limited liability company, by Tim Ritvo, its Managing Member, who acknowledged that he did sign the foregoing instrument and that the same is his/her free act and deed and the free act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 13th day of _December_, 2012.

_____
Notary Public

CYNTHIA VASQUEZ
Notary Public - State of Florida

<u>EXHIBIT A</u>

<u>SITE PLAN</u>

<u>EXHIBIT B</u>

<u>INVENTORY OF EQUIPMENT IN UNIT</u>

2 – 3 Door Reach In Front Bar Backs

2 Hand Sinks

5 Ice Bins

5 Soda Guns

2 – 3 Comp Sinks

2 Top Door Reach In Bar Backs

2 Two Door Reach In Bar Back

1 Ice Machine

1 – 3 Compartment Sinks

1 Slop Sink

8 Booths

50 Bar Stools

1 Large L Shape Booth

13 High Tables

<u>EXHIBIT C</u>

<u>TENANT HANDBOOK</u>

[TO BE FORWARDED UNDER SEPARATE COVER]

EXHIBIT D
USER FEE COLLECTION AND REMITTANCE PROVISIONS

1. Tenant agrees to collect from the purchaser or the recipient of goods or services in each Gross Revenue transaction initiated, consummated, conducted, transacted or otherwise occurring from or within the Premises and/or shall pay to the Collecting Agent the User Fee with respect to such Gross Revenue transaction.

2. Landlord may, from time to time, provide supplemental information relating to the calculation, payment and reporting of User Fees to Tenant including (i) uniform guidelines specifying the scope of the definition of Gross Revenue for purposes of calculating the User Fee due hereunder and (ii) alternate collection, payment and reporting procedures to conform, to the extent practicable, the collection and reporting procedures specified herein to the collection and reporting procedures followed by the State of Florida in its administration of the sales tax laws presently codified in Chapter 212 of the Florida Statutes and all regulations promulgated pursuant thereto, as both may be amended from time to time, which procedures shall take effect no earlier than thirty (30) days after written notice has been provided to all tenants. Landlord shall provide written notice to the Collecting Agent of the name and address of Tenant. Tenant will be entitled to rely on the information provided to the Collecting Agent for purposes of compliance with the requirements of this provision. The Collecting Agent shall also promptly notify Tenant of any procedures that Tenant must follow with respect to informing its customers of the User Fee, as such procedures are established by the Collecting Agent. In connection therewith, Tenant shall inform its customers on the point of sale receipt that the total amount of sales tax includes both sales taxes and the User Fee; provided, however, that each point of sale receipt shall include a brief text disclosure of that fact, and further provided that Tenant shall post at each point of sale a brief written disclosure regarding the User Fee, explaining that it is not a tax, how it is calculated, how sales tax is calculated with respect to it, and how it is reflected on the point of sale receipt.

3. Whether or not collected from its customers, Tenant shall, on a monthly basis, pay all User Fees imposed on all Gross Revenue transactions initiated, consummated, conducted, transacted or otherwise occurring during the immediately preceding month from or within any portion of the Premises during such period. All User Fees shall be due and payable without notice on the date required for payment of State sales tax under Florida Statutes. Tenant shall pay all User Fees directly to the Collecting Agent. The procedures for the imposition, collection, segregation, payment and reporting (but not for the calculation) of the User Fee shall be substantially similar in all material respects to those set forth under state law or as otherwise set forth in any supplemental information provided by the Collecting Agent. Tenant shall report all Gross Revenue and remit the User Fees thereon to the Collecting Agent on a monthly basis at the same time that Tenant reports and remits sales taxes to the State, employing reporting forms and following procedures provided by the Collecting Agent that are intended to be substantially similar to those used and required by the State for the remittance of the State sales taxes. The User Fee shall be calculated and imposed on each Gross Revenue transaction and added to the sales price of such Gross Revenue transaction prior to the calculation and assessment of any State sales tax, and before any sales taxes of any other taxing entity required to be imposed by law. All sales taxes of the State and other taxing entities shall, to the extent that such sales taxes apply to the Gross Revenue transaction, be calculated and assessed on the sum of the Gross Revenue price plus the amount of the User Fee. Specific instructions regarding reporting forms and payment procedures for the User Fee will be provided to Tenant by the Landlord or Collecting Agent, and each Tenant will be entitled to rely thereon for purposes of compliance with these requirements. For purposes of compliance herewith, Tenant will be entitled to rely upon such written notice of the designation of the Collecting Agent. The Landlord shall promptly notify Tenant in writing of the name and address of the Collecting Agent and provide appropriate directions for payment and reporting of the User Fees.

4. Tenant shall, with respect to its Premises, deliver to the Landlord and the Collecting Agent (collectively, the "**Report Recipients**") true and complete copies of all written reports, returns, statements, records and declarations, including any supplements or amendments thereto (collectively, the "**Reports**") made or provided to the State by Tenant in connection with all sales taxes for the corresponding sales tax period at the same time that such Reports are delivered to the State. If any subsequent adjustments, additions or modifications are made by Tenant to any sales taxes reported in such Reports, Tenant shall provide the Report Recipients with true and complete copies of all revised Reports and any other information issued or filed by Tenant in regard thereto. If any such adjustment increases the amount of the User Fee which Tenant is required to remit or pay or results in a refund of such User Fee, Tenant shall process and pay such adjusted User Fee in a manner substantially similar to the process used and required by the State for an adjustment of the State sales taxes. Tenant shall claim any credit or refund or shall pay such additional User Fee in the next monthly reporting period by use of the standard reporting and remittance forms. All Reports made or

provided by Tenant shall be maintained by Tenant for at least three (3) years from the date of submission thereof to the Collecting Agent and the State and, upon written request, will be made available to the Report Recipient for inspection and audit. All Reports received by the Report Recipient shall, and the Report Recipient will cause all Reports to, remain confidential and be used by the Report Recipient, and their employees, agents and consultants only for purposes of collecting the User Fee and enforcing the obligations of Tenant hereunder, unless otherwise required to be made public by law.

5.       Tenant hereby specifically authorizes the Landlord and/or the Collecting Agent, and any accountant or financial consultant designated by the Landlord and/or the Collecting Agent (collectively, the **"Auditor"**) to audit its books and records with respect to the Premises to determine compliance with the User Fee collection and remittance obligations of Tenant under these requirements and to release to the Collecting Agent, and Landlord (but not to any other person, except as required by law) such audited information and any Reports, returns (including sales tax returns), and other documents delivered to the Auditor by the Tenant and any relevant information gathered by the Auditor during an audit or in reviewing such Reports, returns or other documents (collectively, the **"Confidential Information"**); provided, however, that (i) no Auditor may be engaged on a contingency-based compensation system, and (ii) all Confidential Information, together with the contents thereof, shall be deemed proprietary, shall be kept strictly confidential, and shall not be disclosed or otherwise published by any person to whom the Auditor so releases Confidential Information, except for such disclosures or publications as may be required by law. Without limiting the foregoing confidentiality and non-disclosure requirements, any publication or disclosure of Confidential Information submitted by or pertaining to Tenant (or the contents of such Confidential Information) the Collecting Agent (or by anyone else to whom the Auditor is required by law to disclose Confidential Information) will, unless otherwise prohibited or restricted by law, be made only on an aggregated basis together with similar information submitted by other tenants and without direct disclosure of the specific User Fee collections or Gross Revenue transactions of such Tenant. Notwithstanding anything herein contained to the contrary, any information provided to the Collecting Agent will not be deemed to be confidential and will be a public record.  Tenant shall be protected by, and may rely upon, the confidentiality provisions set forth herein.

6.       Tenant shall comply with all policies and requirements of the Collecting Agent regarding the collection and remittance of User Fees and notification to its sales customers of the imposition and collection of the User Fee as such policies and requirements are communicated by the Collecting Agent to Tenant in writing from time to time. The failure or refusal of Tenant to impose, collect or remit the User Fee, or to comply with the requirements concerning notification to its customers as required herein, will constitute a default by Tenant under the terms of this Lease. Tenant hereby acknowledges, prior to conducting any business at the Premises, such Tenant's obligations and liabilities under this Lease, and that no default by Landlord under any provision of the Lease pursuant to which Tenant occupies the Premises will entitle Tenant to any offset, deduction or other defense to payment of all User Fees due hereunder. All User Fees that are not paid when due hereunder will bear interest at the rate of twelve percent (12%) per amount ("Default Rate") and will be subject to a late fee imposed in the sole discretion of the Landlord from time to time, in an amount not to exceed ten percent (10%) of the amount due. If Tenant fails to make timely remittance of any User Fee, it shall pay, or reimburse the Landlord for all costs of enforcement and collection thereof, including reasonable attorney's fees. Notwithstanding anything to the contrary contained herein, the Landlord, or any person designated by the Landlord, (collectively, an **"Enforcing Party"**) shall have the right, but not the obligation, to enforce all provisions of these requirements against Tenant if it fails to comply with any term or condition of these requirements. An Enforcing Party shall also be awarded and recover from Tenant all reasonable costs and expense, including attorneys' fees incurred by such Enforcing Party in successfully enforcing the obligations of Tenant hereunder in any legal proceeding brought or defended by such Enforcing Party.

7.       Whenever notice to Tenant is required pursuant to the provisions hereof, the notice provided shall be deemed sufficient if given in writing to such Tenant at the addresses previously provided to the party giving such notice or at another address which became known to the party giving such notice after a reasonably diligent effort to ascertain the address of such Tenant, including without limitation the address of such Tenant listed in the State's sales tax records.

**THE VILLAGE AT GULFSTREAM PARK**

**Hallandale, Florida**

**LANDLORD**

======================================================================
**THE VILLAGE AT GULFSTREAM PARK, LLC,**
**a Delaware limited liability company**

**TENANT**

======================================================================

**Unit No. 2499**

TABLE OF CONTENTS

# EXHIBIT B

**DISCRIMINATION LAW CENTER, P.A.**

**Attorneys at Law**

**A Private Law Firm**

**2255 Glades Road**
**Suite 324A**
**Boca Raton, Florida 33431**
**(561) 271-1769**

June 22, 2017

**VIA EMAIL AND U.S. MAIL/CERTIFIED MAIL**
**Email:  RICHPATTERSONJR@GMAIL.COM**
**THE VILLAGE AT GULFSTREAM PARK**
**901 S. Federal Highway**
**4th Floor Executive Offices**
**Hallandale Beach, FL 33009**

**Re:  LEASE OF SINZ CLUB, LLC. Dated December 13, 2012**
**NOTICE OF RENEWAL**

**Dear Mr. Patterson:**

**This firm represents Sinz Club, LLC., and I am writing to  exercise the renewal period of the Lease under the provisions set forth in Section 9.4. –"Renewal of Term"**

**READS:**
**Section 9.4 - Renewal of Term.**

       **Tenant is hereby granted an option to extend the Term of this Lease (hereinafter "Original Lease") for one (1) additional period of five (5) year(s) (hereinafter "Renewal Term"), provided that Tenant shall notify Landlord, in writing, no less than six (6) months prior to the commencement of any such Renewal Term of Tenant's intention to exercise such option, and provided further that Tenant at the time of notice of renewal, as well as the commencement date of the Renewal Term, has fully complied with all terms and conditions**

of the Original Lease. The terms and conditions of the Renewal Term shall be the same as the terms and conditions of the Original Lease, excepting for the following modifications:

(a)     Tenant shall have no further right of renewal after the expiration of the Renewal Term.

(b)     The Rent payable during the Renewal Term shall be as set forth in Article I.

Contrary to your alleged comments regarding May 17, 2017 payments, under the provisions of the Lease along with the provisions for granted grace periods, my client has paid the Rent on time, and falls within the purview of the provisions of Renewal of Section 9.4.

Additionally, my client believes based upon comments made regarding the running of the establishment that your Arbitrary conclusions that my client business is not 'in a reputable manner', we need more specifics on what you conclude as not meeting that provision as we see that as discriminatory based, and subject to further investigation by this Firm.  Please provide that in your reply.

Please be aware that we intend to enforce the renewal of this Lease term and to avoid the expense of litigation we believe it would be in the best interest of your client to renew the lease, and we come to an agreement on any issues of "reputable manner" so we can move forward with both parties satisfied.

I look forward in working with you in a cooperating manner.

Sincerely yours,

/s/Jay Romano ATTORNEY DLC